UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
                                                         :

ALFA LAVAL U.S. TREASURY INC., f/k/a TETRA :  No. 11 Civ. 1872 (RJH)
LAVAL U.S. TREASURY, INC., f/k/a TETRA
LAVAL U.S. HOLDINGS AND FINANCE, INC.;  :  ECF Case
DELAVAL, INC., f/k/a ALFA-LAVAL AGRI, INC.;  :
ALFA LAVAL INC.; TETRA LAVAL                :
INTERNATIONAL, S.A., on behalf of itself and as  :
successor to TETRA LAVAL INSURANCE     :
SERVICES, LTD.; and TETRA PAK INC.,      :
                                                         :

                   Plaintiffs,      :

                                     :
       v.                               :
                                     :

NATIONAL UNION FIRE INSURANCE       :
COMPANY OF PITTSBURGH, PA.,         :
                                     :
                   Defendant.   :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S
## MOTION TO STAY THIS ACTION AND COMPEL ARBITRATION

SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, New York  10019
(212) 839-5300

*Attorneys for Defendant*

**TABLE OF CONTENTS**

Page(s)

TABLE OF AUTHORITIES ...................................................................................... ii

PRELIMINARY STATEMENT ............................................................................... 1

BACKGROUND ...................................................................................................... 3

   1.  The Insurance Agreements ........................................................... 3

   2.  The Insurance Program ................................................................. 5

   3.  Resolution of Calculation Disputes .............................................. 6

   4.  Plaintiffs' Calculation Dispute ...................................................... 7

   5.  National Union's Demand For Arbitration, Followed by
      Plaintiffs' Request to Temporarily Stay The Arbitration ............... 8

   6.  Plaintiffs' Declaratory Judgment Claims ..................................... 9

ARGUMENT ........................................................................................................... 9

I.     CALCULATION DISPUTES ARE "DISPUTES OR DIFFERENCES
       ARISING OUT OF THE INTERPRETATION OF THIS AGREEMENT" ...................... 9

II.    EACH OF THE PLAINTIFFS AGREED TO ARBITRATE THIS DISPUTE ................ 13

III.  THE ARBITRATORS MUST DETERMINE THE VALIDITY
       OF PLAINTIFFS' STATUTE OF LIMITATIONS DEFENSE ....................................... 17

CONCLUSION ......................................................................................................... 19

# TABLE OF AUTHORITIES

**Page(s)**

CASES

American Bureau of Shipping v. Tencara Shipyard S.P.A.,
    170 F.3d 349 (2d Cir. 1999)....................................................................................15

AXA Versicherung AG v. New Hampshire Ins. Co.,
    708 F. Supp. 2d 423 (S.D.N.Y. 2010)........................................................................12

Bechtel do Brasil Construcoes Ltda. v. UEG Araucaria Ltda.,
    -- F.3d --, 2011 WL 982330 (2d Cir. Mar. 22, 2011) ...............................................18

Best Concrete Mix Corp. v. Lloyd's of London Underwriters,
    413 F. Supp. 2d 182 (E.D.N.Y. 2006) ........................................................................15

Bishop v. Smith Barney, Inc.,
    No. 97 Civ. 4807, 1998 WL 50210 (S.D.N.Y. Feb. 6, 1998) ......................................14

Dean Witter Reynolds Inc. v. Byrd,
    470 U.S. 213 (1985).....................................................................................................10

Deloitte Noraudit A/S v. Deloitte Haskins & Sells,
    9 F.3d 1060 (2d Cir. 1993)...........................................................................................15

Diamond Waterproofing Sys., Inc., v. 55 Liberty Owners Corp.,
    4 N.Y.3d 247 (2005) ....................................................................................................18

Farm Bureau Mut. Ins. Co. v. Am. Int'l Group, Inc.,
    No. 4:03-cv-10050, 2033 WL 21976034 (S.D. Iowa May 28, 2003).........................11

In re Fruehauf Trailor Corp.,
    No. 98-514 (PJW), 2007 WL 676248 (Bankr. D. Del. Mar. 2, 2007) .......................11

Howsam v. Dean Witter Reynolds,
    537 U.S. 79 (2002)........................................................................................................17

In re Inter County Glass, Inc.,
    No. 04 CV 3579, 2007 WL 2908094 (E.D.N.Y. Sept. 28, 2007)...............................14

JLM Indus., Inc. v. Stolt-Nielsen SA,
    387 F.3d 163 (2d Cir. 2004)..........................................................................................10

Local Union No. 38 v. Custom Air Sys., Inc.,
    357 F.3d 266 (2d Cir. 2004)..........................................................................................13

Magellan Reins. Co. Ltd. v. New Hampshire Ins. Co.,
  7 Misc.3d 1024(A), 2005 WL 1173903 (N.Y. Sup. Ct. Mar. 15, 2005)................................12

Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,
  460 U.S. 1 (1983).................................................................................................................10

Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Dyneer Corp.,
  2004 WL 2093361 (N.Y. Sup. Ct. July 22, 2004) ................................................................12

NECA Ins. Ltd. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.,
  595 F. Supp. 955 (S.D.N.Y. 1984)........................................................................................11

New Hampshire Ins. Co. v. Canali Reins. Co., Ltd.,
  No. 03 Civ. 8889 (LTS), 2004 WL 769775 (S.D.N.Y. Apr. 12, 2004) ..................................12

99 Commercial Street, Inc. v. Goldberg,
  811 F. Supp. 900 (S.D.N.Y. 1993)........................................................................................16

Ronan Assocs. Inc. v. Local 94-94A-94B, Int'l Union of Operating Eng'rs,
  24 F.3d 447 (2d Cir. 1994)....................................................................................................14

Smith Barney Shearson Inc. v. Sacharow,
  91 N.Y.2d 39 (1997) .............................................................................................................10

**STATUTES**

9 U.S.C. § 2...........................................................................................................................1, 10

Defendant National Union Fire Insurance Company of Pittsburgh, Pa., ("National Union") respectfully submits this memorandum of law in support of its motion, pursuant to Sections 3 and 4 of the Federal Arbitration Act, 9 U.S.C. § 2, et seq., to stay this action and compel arbitration.

## PRELIMINARY STATEMENT

For nearly two decades, Plaintiffs, a group of affiliated multinational corporations, have accepted the benefits of a comprehensive insurance program that they procured from National Union and certain related insurers. That program, through which National Union has provided Plaintiffs with workers compensation, automobile liability, and general liability coverage, includes a number of executed agreements and related schedules, which govern the manner in which Plaintiffs are required to remit payment of various expenses, premiums, costs and collateral to National Union. Critically, these same agreements include broad agreements to arbitrate, requiring any and all payment calculation disputes to be submitted to arbitration.

Plaintiffs made payments under this insurance program for many years, including most recently on December 21, 2006 in the amount of $1,017,619.83. Since then, however, plaintiffs have refused to pay their outstanding balances, contending at various times that the balances were improperly calculated or that the responsibility for payment lied with others. After extensive negotiations reached an impasse, in accordance with the parties' written agreements, National Union submitted the dispute to arbitration on September 7, 2010, naming as respondents each of the Plaintiffs herein.

National Union thereafter granted Plaintiffs an extension of time to select a party-appointed arbitrator, and the parties agreed to hold the arbitration in abeyance while attempting once again to resolve the dispute concerning the outstanding balance. At no point have Plaintiffs

ever stated, suggested, or intimated that these claims were not arbitrable. Nonetheless, without any notice, Plaintiffs file the Complaint ("Compl.").

The Complaint is meritless and reflects nothing more than a last-ditch effort by Plaintiffs to avoid, or at least delay performance of, their payment obligations under the subject insurance program. While Plaintiffs contend that National Union's claims are not arbitrable because they do not require an "interpretation" of the agreements, case law firmly holds otherwise. Indeed, the underlying dispute at issue here revolves entirely around the calculation of the premium and deductible amounts that Plaintiffs owe National Union under the agreements. Such disputes can be resolved *only* by resort to the terms of the agreements (including the agreed-upon formulas and numerical inputs).

Plaintiffs also contend that any non-signatory to the agreements cannot be compelled to arbitrate this dispute. That contention also finds no support in the law. Indeed, where a non-signatory knowingly accepts benefits from an agreement that includes an arbitration agreement, that non-signatory cannot then claim that it has no obligation to arbitrate. Here, Plaintiffs make no allegation that they have not accepted -- for a period of many years -- the benefits derived directly from the insurance program. Thus, Plaintiffs must be estopped from now disclaiming the requirement to arbitrate under that insurance program.

Finally, Plaintiffs' contention that the Court should "declare" that certain of the claims to be arbitrated are barred by applicable statutes of limitations is erroneous. As an initial matter, it is well-settled that the arbitrators, not this Court, must determine the merits of any statute of limitations defense. Moreover, National Union submits that the arbitrators will find that the claims are *not* time-barred, inasmuch as the claims did not ripen until December 2006 at the earliest, when Plaintiffs failed to pay the full amounts due.

Accordingly, all proceedings in this action should be stayed and Plaintiffs should be compelled to arbitrate this dispute.

## **BACKGROUND**

1. The Insurance Agreements

In or around 1988, Plaintiffs[1] procured an insurance program from National Union, which provided Plaintiffs with various forms of insurance, including workers compensation, commercial general liability, and commercial automobile coverage, during six policy periods commencing from January 1, 1988 through June 1, 1990, and December 31, 1993 through January 1, 1998 (the "Program").[2] (See Declaration of Harrington Williams, dated April 28,

---

[1]     During the relevant period, each of the Plaintiffs was a part of the "Tetra Laval Group" and engaged in various technology or supply businesses concerning the food industry. As reported in Tetra Laval's 2009-2010 Annual Report, the "Tetra Laval Group" is a "decentralized organi[z]ation but with clear rules and guidelines," which includes Tetra Pak and DeLaval. (See http://www.tetralaval.com/SiteCollectionDocuments/Tetra%20Laval_2009_2010.pdf, at 3-5, 8, last visited on April 25, 2011.) The heads of those entities report to the "Tetra Laval Group Board," and Tetra Laval International provides the Board's financial support and control function, which includes "responsibility for financing the Tetra Laval Group." (Id.) In or about June 2000, Alfa Laval was sold to a private equity company. (See http://www.ikinvest.com/templates/press.aspx?id=2257.) Alfa Laval reports that, "[t]oday, when Alfa Laval is no longer a part of the Tetra Laval Group, the two companies' cooperation is based on a strong alliance." (See http://www.alfalaval.com/solution-finder/customer-stories/Pages/Tetra-Pak.aspx, last visited on April 25, 2011.) For example, Alfa Laval's 2009 Annual Report disclosed that "Tetra Pak within the Tetra Laval Group is Alfa Laval's single largest customer," and that the "Board of Directors for Alfa Laval AB has two representatives from Tetra Laval." (See http://annualreport2009.alfalaval.com/en/Menu/Notes/Note+31-36/Note+34, last visited on April 25, 2011.)
[2]     The allegations in the Complaint concern only the Program period from December 31, 1993 through January 1, 1998, even though National Union's demand for arbitration also covered the earlier period of January 1, 1988 through June 1, 1990. (Williams Decl., ¶ 2 n.1.) Plaintiffs presumably excluded that earlier period from this action because the expense portion of National Union's calculation of the outstanding balance reflects a credit in Plaintiffs' favor during that period. No matter Plaintiffs' reason, the agreements governing the earlier period also require this dispute to be arbitrated, based on arbitration clauses that are substantially similar to those set forth in the Indemnity Agreements (as defined herein). (Id.) Accordingly, National Union requests that the Court's order compel arbitration for that portion of the dispute, as well.

2011 ("Williams Decl."), ¶ 2.)  During the Program, National Union issued a number of insurance policies to Plaintiffs in connection with their commercial activities (the "Policies"). (Id. at ¶ 3.)  The parties also entered into a number of additional agreements, which govern, among other things, Plaintiffs' payment obligations under the Program (collectively referred to herein as the "Indemnity Agreements").  In particular, (i) on September 23, 1995, the parties executed individual contracts for each of the first three periods (December 31, 1992 to December 31, 1993, December 31, 1993 to January 1, 1995, and January 1, 1995 to January 1, 1996), each called Indemnity Agreement (Adjustable); (ii) on February 23, 1996, the parties executed a single Indemnity Agreement (Adjustable), which governed each of the last two periods (January 1, 1996 to January 1, 1997, and January 1, 1997 to January 1, 1998); and (iii) the parties executed two schedules for each of the five policy periods (for a total of ten schedules), called the Policy and Funding Schedule-Retrospective and the Policy and Funding Schedule-Loss Reimbursement.  (Id. at ¶ 4, Exs. 2-15.)

The Indemnity Agreements were executed by Tetra Laval U.S. Treasury Inc., Tetra Laval U.S. Treasury, Inc., Tetra Laval U.S. Holdings Inc., or Tetra Laval U.S. Holdings & Finance, Inc. (collectively, "Tetra Laval U.S."), who acted on behalf of themselves and all other Plaintiffs in connection with the procurement of the Program.[3]  (Id. at ¶ 5.)  Furthermore, in addition to National Union, certain affiliated insurers were parties to the Indemnity Agreements.  (Id.)

The Indemnity Agreements provide that the agreement is between the "Company" (i.e., National Union) and "Client" (i.e., Tetra Laval U.S.).  (Id. at ¶ 6, Exs. 2, 5, 8 & 11 at 1.)

---

[3]     National Union reserves the right to amend its Demand for Arbitration, including, among other things, to add additional respondents, if necessary.  Further, Plaintiff Alfa-Laval Re (Luxembourg) S.A. executed agreements relating to the earlier portion of National Union's Demand for Arbitration (i.e., January 1, 1988 through June 1, 1990), which, like the Indemnity Agreements, also require arbitration for any calculation disputes.  See also note 2, supra.

However, the "Program" is defined as the Indemnity "Agreement, together with the Policy Funding Schedule(s) and Policy(ies)," all of which constitute "a uniquely negotiated, single contract and no part of the Program would have been issued without the other parts being in force." (Id. at ¶ 6, Exs. 2, 5, 8 & 11 at 2; see also id., Exs. 3-4, 6-7, 9-10 & 12-15 at 1 (Schedules are "[a]ttached to and part of the Indemnity Agreement").) Moreover, the Indemnity Agreements provide that the Policies "are governed by this Agreement." (Id., Exs. 2, 5, 8 & 11 at 2.)

2. The Insurance Program

Plaintiffs procured an insurance program that provides for "premium deferral." (Williams Decl., ¶ 7, Exs. 2, 5, 8 & 11 at 1.) Thus, as part of the Program, Plaintiffs are obligated to reimburse National Union for certain expenses (premium), losses, and "Allocated Loss Expenses" (e.g., attorneys' fees) that National Union paid to policy claimants on Plaintiffs' behalf resulting from claims that occurred during the relevant policy years. (Id. passim.) National Union also agreed that, for any claim, it would be responsible for sums in excess of the retention amounts set forth in the Indemnity Agreements. (Id.)

In exchange for National Union's agreement to provide Plaintiffs with substantial insurance coverage, "Client[s] promise[d] to pay each and every charge, fee, Tax, deductible reimbursement, adjustable deductible premium, premium, however named, incurred by Company in providing the Program to Client." (Id. at ¶ 8, Exs. 2, 5 & 8 at 7; 11 at 6.) Plaintiffs agreed that all such payment obligations were to be calculated in the precise manner set forth in the Indemnity Agreements. (Id. passim.) For example, the Indemnity Agreements expressly prescribe the manner in which Plaintiffs' premiums are to be calculated and state that, with respect to the so-called "Adjusted Subject Premium," "[i]f the Policy(ies) provide coverage for

more than one insured, the Adjusted Subject Premium will be determined *for all insureds combined and not separately for each insured*." (Id. at ¶ 9, Exs. 2, 5, 8 & 11 at 2-3 (emphasis added).)  As another example, the Policy and Funding Schedule-Loss Reimbursement for policy year December 31, 1992 to December 31, 1993 provides general liability and products liability deductible amounts for "Tetra Pak" and "Alfa Laval," and workers' compensation deductible amounts for all Plaintiffs.  (Id., Ex. 4 at 2.)

The Indemnity Agreements specifically state that they will govern Plaintiffs' payment obligations *beyond the stated policy year*.  (See id. at ¶ 10, Exs. 2, 5 & 8 at 2-3, 12; 11 at 2-3, 11.)  Indeed, Plaintiffs agreed that the Indemnity Agreements would not terminate until "such time that all reported claims arising out of the issuance of the Policy(ies) are closed," and to the extent any "claims arising out of the issuance of the Policy(ies) are made or reopened, then this Agreement and any security requirements of the Company shall be renewed and shall continue in full force and effect until all such claims are closed."  (Id., Exs. 2, 5 & 8 at 12; 11 at 10.)

3. Resolution of Calculation Disputes

In the event of a dispute relating to calculation of the amounts due from Plaintiffs, the parties agreed to abide by a two-step resolution process, as set forth in the Indemnity Agreements.  First, if Plaintiffs dispute National Union's premium or loss calculation, they are obligated to "provide the Company in writing a description of the items that Client disputes" and then pay the undisputed portion of the balance within 30 days.  (See Williams Decl., ¶ 11, Exs. 2 & 5 at 6-7; 8 at 6; 11 at 5.)  Upon resolution of any such calculation dispute, Plaintiffs agreed that they would pay the outstanding amounts to National Union within 30 days.  (Id., Exs. 2 & 5 at 7; 8 at 7; 11 at 6.)  Thus, a calculation dispute did not become ripe for arbitration unless and until the parties completed this process and payment still was not received.  (Id., Exs. 2, 5 & 8 at

6-7; 11 at 5-6.)

Second, if the parties are unable to resolve a calculation dispute, the Indemnity Agreements require that the dispute be arbitrated. (See id. at ¶ 12, Exs. 2, 5 & 8 at 11; 11 at 10.) Specifically, the Indemnity Agreements provide that "[a]ll disputes or differences arising out of the interpretation of this Agreement shall be submitted to" arbitration. (See id.) Further, each of the Indemnity Agreements provides that "[a]ll matters of interpretation and/or construction of this Agreement are to be interpreted and construed under the law of the State of New York, without reference to its principles concerning conflicts of law." (Id., Exs. 2, 5 & 8 at 14; 11 at 13.)

4. Plaintiffs' Calculation Dispute

It is beyond dispute that Plaintiffs accepted the benefits of insurance coverage from National Union, which was required in order for Plaintiffs to operate their businesses. Indeed, National Union has paid more than $18.7 million in losses to policy claimants, and to date, Plaintiffs have reimbursed National Union in the amount of approximately $16 million (and presently dispute a portion of the difference). (See Williams Decl., ¶ 13, Ex. 1 and Exhibit A thereto.) Likewise, National Union also billed Plaintiffs for other premium and other agreed upon expenses and costs, much of which has been paid. (See id.)

The dispute over Plaintiffs' refusal to pay the present outstanding balance arose in late 2006. In particular, Plaintiffs disputed National Union's calculation concerning three underlying claims, but, on December 21, 2006, paid a portion of the outstanding balance, wiring $1,017,619.83 to National Union. (See id. at ¶ 14, Ex. 16.) Then, in March 2007, seeking to explain the basis for Plaintiffs' position, Plaintiffs' insurance broker prepared a document called "Tetra Laval[,] AIG Paid Loss Billing Project[,] Outline of Results[,] As of 03/21/07"

(hereinafter, the "Tetra Laval Chart"). (See id., Ex. 17.) In the Tetra Laval Chart, Plaintiffs' broker described the amounts that Plaintiffs believed related to insurance coverage provided to "Tetra Pak," "DeLaval" or "Alfa Laval," each of which is a Plaintiff herein. (Id.) The Tetra Laval Chart also reflected Plaintiffs' December 21, 2006 wire transfer, attributing a substantial portion of that payment to each of Plaintiffs "Tetra Pak," "DeLaval" and "Alfa Laval." (Id.)

In an effort to resolve this dispute, National Union participated in conference calls with representatives of Plaintiffs Tetra Pak, DeLaval, and Alfa Laval, and their brokers, among others. (See id. at ¶ 15, Ex. 15 at 1 (Letter from Jason R. Goldy, dated September 29, 2009).) In September 2009, National Union once again requested Plaintiffs to pay the undisputed portion of the balance. (Id.) The parties continued their discussions into late 2009, where, in an email copying the "Director, Group Risk Financing & Insurance," of Plaintiff Tetra Laval International, S.A., Plaintiffs' insurance broker represented that she had "spoken to Leo Pacyna [of Plaintiff Tetra Pak] and Wyatt Smith [of Plaintiff DeLaval] and they both look forward to resolving this" calculation dispute. (See Declaration of Alex J. Kaplan, dated April 28, 2011 (the "Kaplan Decl."), ¶ 3, Ex. A.)

5. National Union's Demand for Arbitration,
   Followed by Plaintiffs' Request to Temporarily Stay the Arbitration

After discussions reached an impasse, on September 7, 2010, National Union served its Demand For Arbitration on each of the Plaintiffs. (See Williams Decl., Ex. 1.) On October 1, 2010, in response to the Demand for Arbitration, Plaintiff Alfa Laval requested a 30-day extension of its time to select an arbitrator. (See Kaplan Decl., ¶ 4, Ex. B.) The request for an extension was subsequently made on behalf of all of the Plaintiffs herein. (See id. at ¶ 5, Ex. C.)

The parties subsequently agreed on October 29, 2010 to suspend the arbitration until 45 days after National Union provided additional information requested by Plaintiffs. (See id. at ¶

6, Ex. D; see also id., Ex. E (acknowledging National Union's suspension of the arbitration to discuss the calculation dispute). In good faith reliance upon this agreement, National Union spent a number of months collecting information requested by Plaintiffs. On February 2, 2011, as the parties agreed, National Union provided a substantial amount of information to Plaintiffs' counsel, and informed counsel that, barring further agreement, pursuant to the parties' existing agreement, the arbitration would resume on March 22, 2011. (Id. at ¶ 7.) Plaintiffs failed to respond to that information. (Id. at ¶ 8.)

6. **Plaintiffs' Declaratory Judgment Claims**

On March 17, 2011, just five days before the parties agreed that the voluntary suspension of the arbitration would be lifted, and without any notice, Plaintiffs filed this lawsuit. The Complaint asserts two counts, each of which requests declaratory relief:

- In Count I, Plaintiffs request the Court to determine whether this calculation dispute is arbitrable and whether non-signatory Plaintiffs can be compelled to arbitrate. (Compl. ¶¶ 21-25.)

- In Count II, Plaintiffs request the Court to determine whether Plaintiffs can be held responsible for any damages that accrued from their breaches of the Indemnity Agreements more than six years before the date that Defendant served its Demand for Arbitration. (Id. ¶¶ 26-32.)

As explained below, each of Plaintiffs' requests is improper, and National Union respectfully requests the Court to stay this action and compel Plaintiffs to proceed with the already-commenced arbitration of this dispute.

## ARGUMENT

**I. CALCULATION DISPUTES ARE "DISPUTES OR DIFFERENCES ARISING OUT OF THE INTERPRETATION OF THIS AGREEMENT"**

Plaintiffs do not dispute the validity of the arbitration clauses in the Indemnity Agreements. Instead, they assert that the arbitration clauses are narrowly circumscribed and do

not encompass the calculation dispute underlying National Union's demand for arbitration.  They are wrong.

As an initial matter, the arbitrability question presented by this lawsuit is governed by the Federal Arbitration Act (the "FAA"), given that the insurance program at issue here necessarily involved interstate commerce.  See 9 U.S.C. § 2.  The FAA was designed to "ensure judicial enforcement of privately made agreements to arbitrate."  Dean Witter Reynolds Inc. v. Byrd, 470 U.S. 213, 219 (1985).  The FAA represents "a strong federal policy favoring arbitration as an alternative means of dispute resolution."  JLM Indus., Inc. v. Stolt-Nielsen SA, 387 F.3d 163, 171 (2d Cir. 2004) (citation omitted).  Therefore, "under the FAA, 'any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability.'"  Id. (quoting Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25 (1983)).  The FAA requires that a contract provision to arbitrate disputes arising out of the contract "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.[4]

Under the FAA, the Court's inquiry into the arbitrability of a dispute is limited to the following threshold inquiries:  (1) whether a valid agreement or obligation to arbitrate exists; (2) whether the particular dispute sought to be arbitrated falls within the scope of the parties' agreements; (3) if federal statutory claims are asserted, whether Congress intended those claims to be nonarbitrable; and (4) if some, but not all, of the claims are arbitrable, whether to stay the balance of the proceedings pending arbitration.  JLM Indus., 387 F.3d at 169.  In the case at bar,

---

[4]     This policy is in clear accord with the policy of the State of New York.  See Smith Barney Shearson Inc. v. Sacharow, 91 N.Y.2d 39, 49 (1997) (New York "favors and encourages arbitration").

only the first and second inquiries are applicable, and the record compels a conclusion that Plaintiffs are bound by the terms of the Indemnity Agreements and that the parties' dispute must be determined by a panel of arbitrators.

As explained, the dispute underlying this lawsuit concerns Plaintiffs' failure to remit payment on a balance that has been unpaid and outstanding since December 2006, based on Plaintiffs' contention that it was improperly calculated by National Union.  See pages 7-8, supra. The calculations at issue are governed by the specific terms of the Indemnity Agreement, and because any dispute relating thereto necessarily constitutes a "dispute[] or difference[] arising out of the interpretation of this Agreement," National Union submitted the dispute to arbitration.

National Union's decision to submit this calculation dispute to arbitration is supported by well developed jurisprudence.  Indeed, courts have made clear that payment calculation disputes, like the one here, are "disputes or differences arising out of the interpretation of this Agreement." See, e.g., NECA Ins. Ltd. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa., 595 F. Supp. 955, 958 (S.D.N.Y. 1984) (claim arbitrable where dispute concerned "[w]hether the payment in excess of $500,000 was in settlement of a claim within the meaning of" agreement, reasoning that, "[a]s soon as differing interpretations of the contract's provisions determine the liabilities of the parties, the dispute is within the scope of the arbitration clause in this contract"); In re Fruehauf Trailor Corp., No. 98-514 (PJW), 2007 WL 676248, at *6 (Bankr. D. Del. Mar. 2, 2007) (same, where "dispute centers on the appropriate calculation of the amount of additional cash collateral that [insured] owes [National Union] or the amount of excess cash collateral that [National Union] must return to" insured and, therefore, requires interpretation of "actuarial review"); Farm Bureau Mut. Ins. Co. v. Am. Int'l Group, Inc., No. 4:03-cv-10050, 2003 WL 21976034, at *4 (S.D. Iowa May 28, 2003) (claim seeking "declaration setting forth what amount, if any, it

owes defendants under the terms of the Reinsurance Facilities" arbitrable because such a claim "require[s] decision-maker to interpret terms of the Reinsurance Facilities"); In re Transport Assocs., Inc., 263 B.R. 531, 535 (Bankr. W.D. Ky. 2001) (claim arbitrable where bankruptcy "Trustee contends that [National Union] received more premiums from the debtor than its actual losses totaled under the two insurance policies"); see also New Hampshire Ins. Co. v. Canali Reins. Co., Ltd., No. 03 Civ. 8889 (LTS), 2004 WL 769775, at *2-3 (S.D.N.Y. Apr. 12, 2004) ("indication that there is any dispute over the calculation of the amounts due" requires arbitration where parties agreed that "[a]ll disputes or differences arising out of the interpretation of this Agreement shall be submitted" to arbitration, but declining to compel arbitration because arbitration clause did not cover insurer's alleged failure to perform); see also generally Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Dyneer Corp., 2004 WL 2093361 (N.Y. Sup. Ct. July 22, 2004) (denying insured's request to vacate order appointing arbitrator, which involved a payment dispute and a substantially identical arbitration clause).[5]

---

[5]    These decisions highlight the important difference between a dispute over an insured's payment obligation as opposed to a dispute concerning policy coverage, which in some circumstances may not be arbitrable.  Cf. AXA Versicherung AG v. New Hampshire Ins. Co., 708 F. Supp. 2d 423, 428, 430 (S.D.N.Y. 2010) ("arbitration clauses limited to interpretive disputes are widely understood to cover only those disputes that can be resolved by reference to the terms of the contract," which thereby exclude fraudulent inducement claims); National Union Fire Ins. Co. of Pittsburgh, Pa v. GE Betz, Inc., 13 A.D.3d 122 (1st Dep't 2004) ("dispute over which insurance policy should be applied to the settlement of an action brought against respondent by one of its former employees [is] a matter not involving any dispute or difference over the cash collateral agreement's interpretation"); Magellan Reins. Co. Ltd. v. New Hampshire Ins. Co., 7 Misc.3d 1024(A), 2005 WL 1173903, at *1-2 (N.Y. Sup. Ct. Mar. 15, 2005) ("petitioner's failure to deposit funds into a trust account, a requirement under the reinsurance agreement," is not a "dispute[] or difference[] arising out of the interpretation of [the] Agreement").  The matter in dispute at bar does not involve any coverage dispute or allegations of fraud but instead concerns Plaintiffs' contention that National Union incorrectly computed the outstanding balance.  Thus, resolution will depend entirely upon an interpretation of the figures and formulas set forth in the Indemnity Agreements, which were used to compute the balance that Plaintiffs have failed to pay.

Thus, as a matter of law, this calculation dispute must be arbitrated, and the portion of Count I of the Complaint that seeks a declaration that "Defendant's claims are not arbitrable under the arbitration clause in the Indemnity Agreements" should be denied. (Compl. ¶ 25.)

## II.    EACH OF THE PLAINTIFFS AGREED TO ARBITRATE THIS DISPUTE

There is no dispute that each of the Plaintiffs in this action received benefits under the insurance program. Indeed, the Complaint contains no allegation to the contrary. Therefore, each Plaintiff is bound by the arbitration clauses set forth in the Indemnity Agreements.

As an initial matter, Plaintiffs concede in their Complaint that each of the plaintiff signatories to the Indemnity Agreements agreed to arbitrate disputes arising under those agreements. (Compl. ¶¶ 1, 24.) Those signatories include plaintiffs Tetra Laval U.S. Treasury, Inc. and Tetra Laval U.S. Holdings & Finance, Inc. (which are alleged to be the entities now known as plaintiff Alfa Laval U.S. Treasury Inc.). (Williams Decl., Exs. 2-15.)

Thus, Plaintiffs' contention apparently is that the remaining Plaintiffs -- DeLaval, Inc. (f/k/a Alfa-Laval Agri, Inc.), Alfa Laval Inc., Tetra Laval International, S.A., Tetra Laval Insurance Services. Ltd., and Tetra Pak Inc. -- are not obligated to arbitrate because they did not sign the Agreements. This position, however, is legally unsupportable.

In the Second Circuit, an arbitration agreement may be enforced against a non-signatory under several circumstances. See Local Union No. 38 v. Custom Air Sys., Inc., 357 F.3d 266, 268 (2d Cir. 2004). A number of these circumstances are present here.

First, there is no dispute that each of the non-signatory Plaintiffs received its insurance coverage pursuant to the Policies that are at issue in this calculation dispute. See page 7, supra. Critically, those policies are incorporated by reference in the Indemnity Agreements:

> The Company will issue the insurance policies listed in the Policy Funding Schedule(s). Such policies and all renewals thereof are governed by this Agreement and are referred to herein as the 'Policy(ies). This Agreement,

> together with the Policy Funding Schedule(s) and Policy(ies)', constitute the Program. The Program is a uniquely negotiated, single contract and no part of the Program would have been issued without the other parts being in force.

(Williams Decl. ¶ 6, Exs. 2, 5, 8 & 11 at 2.) Likewise, the parties agreed that, "[i]f the Policy(ies) provide coverage for more than one insured, the Adjusted Subject Premium will be *determined for all insureds combined and not separately for each insured*." (Id. at ¶ 10, Exs. 2, 5, 8 & 11 at 2-3 (emphasis added).)

Thus, because the Indemnity Agreements incorporated by reference the policies pursuant to which the non-signatory Plaintiffs received coverage, they must arbitrate this dispute. See, e.g., Bishop v. Smith Barney, Inc., No. 97 Civ. 4807, 1998 WL 50210, at *5 (S.D.N.Y. Feb. 6, 1998) (granting motion to compel arbitration, reasoning that "Incorporation by reference arises when a 'party to an arbitration agreement . . . has entered into a separate contractual relationship with the nonsignatory which incorporates the existing arbitration clause.'"); In re Inter County Glass, Inc., No. 04 CV 3579, 2007 WL 2908094, at *6 (E.D.N.Y. Sept. 28, 2007) (same on summary judgment, explaining that "[t]he fact that Inter County did not sign the CBA is immaterial. In a case involving an unsigned CBA, the Second Circuit found that '[p]arties are plainly free to incorporate by reference, and bind themselves *inter sese* to, terms that may be found in other agreements to which they are not a party.'") (quoting Ronan Assocs. Inc. v. Local 94-94A-94B, Int'l Union of Operating Eng'rs, 24 F.3d 447, 449 (2d Cir. 1994)).

Second, because each of the Plaintiffs (signatories and non-signatories alike) indisputably received benefits under the insurance program, the doctrine of estoppel bars them from seeking to avoid arbitration of any payment disputes. The record of these benefits is clear. For example, in the Tetra Laval Chart, Plaintiffs' insurance broker confirmed that "Tetra Pak," "DeLaval," and "Alfa Laval" all received coverage from National Union under the subject policies. See pages 7-

8, supra.  The Complaint does not allege to the contrary.  Thus, all non-signatory Plaintiffs are bound to the arbitration agreement by estoppel.  See, e.g., American Bureau of Shipping v. Tencara Shipyard S.P.A., 170 F.3d 349, 353 (2d Cir. 1999) (party estopped from denying obligation to arbitrate when it receives "direct benefit" from contract containing an arbitration clause); Best Concrete Mix Corp. v. Lloyd's of London Underwriters, 413 F. Supp. 2d 182, 187 (E.D.N.Y. 2006) (by accepting benefits under insurance policy, non-signatories were estopped from avoiding arbitration, reasoning that "[t]he Court recognizes that a number of cases in this circuit applying the estoppel theory involve non-signatories that failed to object to an arbitration clause despite having actual knowledge of the contents of an agreement. . . . Nonetheless, even if Best had not actually seen the policy before initiating its declaratory judgment action, it is surely chargeable with knowledge of its contents; the certificate issued by Larsen identified the policy by number and put Best on notice that it had been issued in London by Underwriters.  Despite such notice, Best does not claim that it requested and was denied a copy of the policy.") (citing Deloitte Noraudit A/S v. Deloitte Haskins & Sells, 9 F.3d 1060, 1064 (2d Cir. 1993)).

Moreover, the Plaintiffs, who attached to their Complaint a group exhibit of the Indemnity Agreements, do not allege that any of the non-signatory Plaintiffs ever objected to the Indemnity Agreements (or the arbitration clauses contained therein).  Had the non-signatory Plaintiffs made any such an objection, the Program would not have been issued, given that the Indemnity Agreements, along with the Policies, form a "uniquely negotiated, single contract and *no part of the Program would have been issued without the other parts being in force*." (Williams Decl. ¶ 6, Exs. 2, 5, 8 & 11 at 2 (emphasis added).)  See also Deloitte, 9 F.3d at 1064 (compelling arbitration where non-signatory beneficiary purportedly did not receive arbitration agreement until after it was executed).

Third, the non-signatory Plaintiffs must arbitrate this calculation dispute for the additional reason that the signatory Plaintiffs had the authority to, and did in fact, bind the non-signatory Plaintiffs. During the periods in which coverage was provided by the Program, all of the Plaintiffs indisputably were affiliated with one another. (See page 3 n. 1, supra.) Moreover, there is no dispute that each of the Plaintiffs received insurance coverage from National Union. (See pages 7-8 supra; Williams Decl., Ex. 17 (Tetra Laval Chart states how Plaintiffs apportioned the December 2006 wire transfer among Tetra Pak, DeLaval and Alfa Laval).) Further, the Indemnity Agreements provide that, along with the Policies, they form a "uniquely negotiated, single contract and *no part of the Program would have been issued without the other parts being in force*," and state further that, if coverage is provided to "more than one insured, the Adjusted Subject Premium will be determined for all insureds combined and not separately for each insured." (Id. at ¶¶ 6, 9, Exs. 2, 5, 8 & 11 at 2-3 (emphasis added).) Thus, when the Indemnity Agreements were executed, it was clear that the signatory Plaintiffs had the authority to sign on behalf of all Plaintiffs, including the non-signatory Plaintiffs, meaning all Plaintiffs agreed to be bound by the entirety of the Program -- including the agreement to arbitrate calculation disputes. Thus, principles of agency dictate that, whether by actual or implied authority, the non-signatory Plaintiffs are bound by the Indemnity Agreements and their respective arbitration clauses. See, e.g., 99 Commercial Street, Inc. v. Goldberg, 811 F. Supp. 900, 906-07 (S.D.N.Y. 1993) (granting defendants' motion to compel arbitration, where escrow agent executed agreement on behalf of plaintiffs).

Accordingly, for any of these reasons, each of the Plaintiffs is obligated to arbitrate this calculation dispute.

**III.    THE ARBITRATORS MUST DETERMINE THE VALIDITY
OF PLAINTIFFS' STATUTE OF LIMITATIONS DEFENSE**

Plaintiffs incorrectly allege that N.Y. C.P.L.R. § 213(2) bars "any claim for damages arising out of a purported breach of the Indemnity Agreements that accrued before September 7, 2004."  (Compl. ¶ 32.)  That allegation is wrong and, more fundamentally, well-established precedent makes clear that the merits of Plaintiffs' statute of limitations defense must be determined by the arbitrators.

In Howsam v. Dean Witter Reynolds, 537 U.S. 79 (2002), the United States Supreme Court held that, "whether prerequisites such as *time limits*, notice, laches, estoppel, and other conditions precedent to an obligation to arbitrate have been met, are for the arbitrators to decide."  Id. at 85 (emphasis in original).  Thus, it is well settled that, absent the parties' express agreement to the contrary, timeliness issues relating to an arbitrable dispute are not properly determined by a court.  Id.  It is clear that the parties at bar did not so agree.

As an initial matter, while each of the Indemnity Agreements includes a New York choice of law provision, they are silent concerning the "enforcement" of the agreements. Specifically, those clauses state, "All *matters of interpretation and/or construction of this Agreement* are to be interpreted and construed under the law of the State of New York, without reference to its principles concerning conflicts of law." (Williams Decl., ¶ 12, Exs. 2, 5 & 8 at 14; 11 at 13.)

The absence of the term "enforcement" in the choice of law provisions is critical to this analysis.  Indeed, as stated by the New York Court of Appeals:

> It is well settled that where "parties broadly agree[ ] to arbitrate 'any controversy'" arising from their contracts, they may – as with any contract – add qualifications to that clause by providing that New York law will govern the agreement and its enforcement (Luckie, 85 N.Y.2d at 202, 623 N.Y.S.2d 800, 647 N.E.2d 1308). A choice of law provision, which states that New York law shall govern both "the agreement *and its enforcement,*" adopts as "binding New York's

rule that threshold Statute of Limitations questions are for the courts" (id.).  In *the absence of more critical language concerning enforcement, however, all controversies, including issues of timeliness, are subjects for arbitration.*

Diamond Waterproofing Sys., Inc., v. 55 Liberty Owners Corp., 4 N.Y.3d 247, 253 (2005)

(emphasis added).  This holding very recently was confirmed by the Second Circuit in Bechtel

do Brasil Construcoes Ltda. v. UEG Araucaria Ltda., -- F.3d --, 2011 WL 982330 (2d Cir. Mar.

22, 2011), where the court wrote:

> [T]he contracts at issue here do not, in fact, state that their "enforcement" shall be governed by New York law. While Bechtel may be correct that a New York court might find that the "effect" language in the contracts is synonymous with this 'enforcement' language, the fact that the parties did not use the particular "enforcement" language referenced in Diamond Waterproofing weakens Bechtel's argument that this language indicates the parties' clear intent to permit a court to decide timeliness issues pursuant to C.P.L.R. 7502(b).

Id. at *7 (stating further that, consistent with Supreme Court precedent, "any ambiguity in the

contract must be resolved in favor of arbitration").  Thus, only the arbitrators are empowered to

determine the merits of Plaintiffs' statute of limitations affirmative defense.

Moreover, Plaintiffs' purported statute of limitations defense is fatally flawed.  While

Plaintiffs allege conclusorily that the statute of limitations should bar "any claim for damages

arising out of a purported breach of the Indemnity Agreements that accrued before September 7,

2004" (Compl. ¶ 32), during the arbitration, National Union will present evidence to the

arbitration panel that no such claim accrued until, at the earliest, December 21, 2006.  (See

Williams Decl., ¶ 14.)  Indeed, not until then -- *when Plaintiffs wired what it deemed to be the*

*undisputed portion ($1,017,619.83) to National Union* -- did Plaintiffs confirm to National

Union that it would not pay the full amount outstanding.  (Id.; see also id. at ¶ 14, Ex. 17 (March

2007 Tetra Laval Chart reflecting December 2006 wire payment).)  When efforts aimed at

resolution reached an impasse, National Union submitted this dispute to arbitration on September

7, 2010, well within the six-year statute of limitations period.  See CPLR § 213(2). Thus, the arbitrators will have more than sufficient evidence to reject Plaintiffs' statute of limitations defense.

## **CONCLUSION**

For all of the foregoing reasons, Defendant National Union respectfully requests that the Court stay this action and compel Plaintiffs to arbitrate the dispute pursuant to National Union's Demand for Arbitration, and grant such other and further relief as it deems just and proper.

Dated: New York, New York
      April 28, 2011

SIDLEY AUSTIN LLP

By:  s/ Alex J. Kaplan
    Andrew W. Stern (astern@sidley.com)
    Alex J. Kaplan (ajkaplan@sidley.com)
    Jon W. Muenz (jmuenz@sidley.com)
    787 Seventh Avenue
    New York, New York 10019
    Telephone: (212) 839-5300
    Facsimile:  (212) 839-5599

*Attorneys for Defendant National Union Fire*
*Insurance Company of Pittsburgh, Pa.*