UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
                                                                      :

ALFA LAVAL U.S. TREASURY INC., f/k/a TETRA  :   No. 11 Civ. 1872 (RJH)
LAVAL U.S. TREASURY, INC., f/k/a TETRA        :
LAVAL U.S. HOLDINGS AND FINANCE, INC.;     :   ECF Case
DELAVAL, INC., f/k/a ALFA-LAVAL AGRI, INC.; :
ALFA LAVAL INC.; TETRA LAVAL                    :
INTERNATIONAL, S.A., on behalf of itself and as :
successor to TETRA LAVAL INSURANCE        :
SERVICES, LTD.; and TETRA PAK INC.,        :
                                                                       :
                      Plaintiffs,                    :
                                                                       :
                           v.                           :
                                                                        :
NATIONAL UNION FIRE INSURANCE             :
COMPANY OF PITTSBURGH, PA.,               :
                                                                        :
                    Defendant.                 :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF**
**DEFENDANT'S MOTION TO STAY THIS ACTION AND COMPEL ARBITRATION**

SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, New York  10019
(212) 839-5300

*Attorneys for Defendant*

# TABLE OF CONTENTS

                                                                       **Page(s)**

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ..........................................................................................1

ARGUMENT ........................................................................................................................2

I. THIS DISPUTE AROSE OUT OF PLAINTIFFS' DISAGREEMENT WITH NATIONAL UNION'S CALCULATION OF THE OUTSTANDING BALANCE ..........................................................................................................2

II. CONTROLLING PRECEDENT REQUIRES THIS CALCULATION DISPUTE TO BE ARBITRATED ...............................................................................4

    A. Plaintiffs Mischaracterize Precedent Requiring Calculation Disputes To Be Arbitrated ..............................................................................4

    B. Plaintiffs Rely On Irrelevant Policy Coverage and Fraudulent Inducement Cases .........................................................................................6

III. ALL NON-SIGNATORY PLAINTIFFS AGREED TO ARBITRATION .........................7

IV. PLAINTIFFS' STATUTE OF LIMITATIONS DEFENSE MUST BE SUBMITTED TO THE ARBITRATION PANEL ...................................................10

CONCLUSION ...................................................................................................................10

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

AXA Versicherung AG v. N.H. Ins. Co.,
  708 F. Supp. 2d 423 (S.D.N.Y. 2010).......................................................................................7

Bechtel v. UEG Araucaria Ltda.,
  638 F.3d 150 (2d Cir. 2011)....................................................................................................10

Fabry's S.R.L. v. IFT Int'l, Inc.,
  02 Civ. 9855 (SAS), 2003 U.S. Dist. LEXIS 8597 (S.D.N.Y. May 21, 2003).........................7

Farm Bureau Mut. Ins. Co. v. Am. Int'l Group, Inc.,
  No. 4:03-cv-10050, 2003 WL 21976034 (S.D. Iowa May 28, 2003)....................................4, 5

In re Fruehauf Trailer Corp.,
  No. 98-514 (PJW), 2007 WL 676248 (Bankr. D. Del. Mar. 2, 2007) .......................................5

Gerling Global Reins. Corp. v. Home Ins. Co.,
  752 N.Y.S.2d 611 (N.Y. App. Div. 2002) ................................................................................7

Magellan Reins. Co. Ltd. v. New Hampshire Ins. Co.,
  7 Misc.3d 1024(A), 2005 WL 1173903 (N.Y. Sup. Ct. Mar. 15, 2005)................................6, 7

Masefield AG v. Colonial Oil Indus., Inc.,
  No. 05 C 2231 (PKL), 2005 U.S. Dist. LEXIS 6737 (S.D.N.Y. Apr. 18, 2005).....................10

Merrill Lynch Inv. Managers v. Optibase, Ltd.,
  337 F.3d 125 (2d Cir. 2003).....................................................................................................9

Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. GE Betz, Inc.,
  No. 105991/03, 2003 WL 25668854 (N.Y. Sup. Ct. July 1, 2003) ......................................6, 7

New Hampshire Ins. Co. v. Canali Reins. Co., Ltd.,
  No. 03 Civ. 8889 (LTS), 2004 WL 769775 (S.D.N.Y. Apr. 12, 2004) .................................5, 6

# PRELIMINARY STATEMENT

National Union's moving papers[1] demonstrated that this dispute must be arbitrated because it revolves around the Plaintiffs' payment obligations arising from the provisions of the Indemnity Agreements. In response, Plaintiffs construct and then knock down a straw man argument: they claim that the dispute is not arbitrable because they do not dispute National Union's interpretation of the Indemnity Agreements, and that they merely have failed to pay what National Union says is due. This contention, however, cannot be squared with the record, including, most notably, the prior statements of Plaintiffs and their agent --- in short, the very statements and conduct that led National Union to submit this dispute to arbitration. Because resolution of this dispute may be resolved only by reference to, interpretation of, and enforcement of the formulas and inputs contained in the Indemnity Agreements, and "all disputes or differences arising out of the interpretation" of those agreements must be arbitrated, National Union's motion should be granted. See Point I.

Plaintiffs also mischaracterize precedents regarding the arbitrability of payment calculation disputes and rely upon inapposite case law. A plain reading of the controlling case law, and the strong federal policy favoring arbitration, support granting National Union's motion. See Point II.

Plaintiffs further argue that, even if the dispute is arbitrable, the Plaintiffs that did not sign the Indemnity Agreements cannot be compelled to arbitrate. As demonstrated in the moving papers, and as Plaintiffs concede, all of the Plaintiffs have received the benefit of

---

[1] All defined terms are used as in National Union's moving brief ("Br."). Plaintiffs' opposition brief is referred to as the "Opposition" or "Opp.," and the Affidavit of Heather Taylor is referred to as the "Taylor Aff." The term "Ex." or "Exs." refers to exhibits(s) 1-18 annexed to the declaration of Harrington Williams, or exhibit(s) A-F annexed to the initial and reply declarations of Alex Kaplan, submitted in support of National Union's Motion.

millions of dollars of insurance coverage from National Union, and the amounts they have been obligated to pay for those benefits "have been calculated using the agreed-upon formula set forth in the Indemnity Agreement." Because the Indemnity Agreements state that, together with the policies, they form "a uniquely negotiated, single contract and no part of the Program would have been issued without the other parts being in force," the non-signatory Plaintiffs are bound to arbitrate this calculation dispute as well. See Point III.

Finally, Plaintiffs' effort to litigate in this Court the merits of their purported statutes of limitations-based defenses must be rejected. Because the parties did not expressly agree in advance that matters of "enforcement" of the agreements to arbitrate would be governed by New York law, only an arbitration panel may consider Plaintiffs' defenses to liability – including the application of statutes of limitations. See Point IV.

## ARGUMENT

### I. THIS DISPUTE AROSE OUT OF PLAINTIFFS' DISAGREEMENT WITH NATIONAL UNION'S CALCULATION OF THE OUTSTANDING BALANCE

Plaintiffs' contention that "the payment dispute does not 'on its face' raise any issues concerning interpretation of the Indemnity Agreements" (Opp. at 6) is erroneous. As an initial matter, the Indemnity Agreements concern only the manner in which Plaintiffs' payment responsibility under the Policies is to be calculated, as well as the steps the parties must take to resolve any calculation disputes. Br. at 4, 6. Thus, any dispute about the calculation of the amounts that Plaintiffs owe – which this indisputably is – must be a "dispute[] or difference[] arising out of the interpretation of this Agreement."

In any event, at its core, *this* dispute, which arose in December 2006, revolves entirely around the parties' competing calculations of the outstanding balance owed by Plaintiffs. Indeed, following Plaintiffs' expressed disagreement with National Union's calculation

concerning three claims underlying the outstanding balance, Plaintiffs paid a portion of the balance by wiring $1,017,619.83 to National Union. Id. at 7. To determine this amount, Plaintiffs interpreted the Indemnity Agreements, which they reduced into the Tetra Laval Chart, where they set forth their view of the undisputed portion (the aforementioned wire) and the "amount disputed with AIG," totaling $454,689. Id.; Ex. 17 at 2. Further, in March 2007, Plaintiffs' broker informed Plaintiffs that "your *results* indicate a discrepancy with AIG" of $454,689. Ex. F at 2 (emphasis added).

These "results" were the product of Plaintiffs' interpretation and application of the formulas and inputs contained in the Indemnity Agreements. Taylor Aff. at ¶¶ 2, 5 (since 2006, "amounts due to National Union have been calculated using the agreed-upon formula set forth in the Indemnity Agreements"). Specifically, Plaintiffs agreed that their responsibility for any premium and losses would be calculated using the formulas set out in Article II, Sections A-F of each of the Indemnity Agreements, as informed by the definitions in Article IV, as well as parts B-D and F-G of the related Schedules. Exs. 2, 5, 8 & 11 at Secs. A-F; Exs. 3-4, 6-7, 9-10 & 12-15 at 2-3; Taylor Aff. at ¶ 5.[2] Given that Plaintiffs' "results indicate[d] a discrepancy with AIG," it is clear that Plaintiffs' interpretations of the agreed-upon formulas diverged from National Union's interpretation. Because that dispute has never been resolved (see, e.g., Ex. 18 at 2), National Union's only recourse was to demand arbitration. Ex. 1 at 3 (National Union's Demand for Arbitration seeks "an award *determining all amounts due to it under the Agreements* and an award providing for payment of all such amounts, plus interest") (emphasis added).

---

[2] For example, Article II-B provides that, 66 months after inception, "Adjusted Subject Premium for the retrospectively rated Policy(ies) is the sum of: (i) Basic Premium; and (ii) Converted Losses; and (iii) Workers' Compensation Excess Loss Premium, each separately multiplied by the Tax Multiplier." Exs. 2, 5, 8 & 11 at 3. This provision, along with each of the defined terms therein, will require interpretation. See also, e.g., Ex. 1 (calculating same).

Critically, even Plaintiffs' characterization of this dispute – that it "concerns only one thing: National Union's failure to supply documentation of the insurance payments it allegedly made on the Plaintiffs' behalf" (Opp. at 13) – confirms that this dispute must be arbitrated. Specifically, the Indemnity Agreements dictate that National Union "agrees to invoice (with *appropriate* backup documentation) Client for all Paid Losses." Exs. 2, 5, 8 & 11 at Art. III (emphasis added). Plaintiffs state that, "in early 2011, National Union produced some documents that National Union asserted supported the amounts set forth in the 2009 Invoice." Taylor Aff. at 16; see also Kaplan Decl. at ¶ 7 ("National Union provided a substantial amount of information to Plaintiffs' counsel"); Opp. at 4-5. This production satisfied National Union's contractual obligations to provide "appropriate backup documentation." Thus, inasmuch as Plaintiffs disagree with the adequacy of that documentation, their only recourse is to submit to arbitration to resolve the meaning of the phrase "appropriate backup documentation."

## II. CONTROLLING PRECEDENT REQUIRES THIS CALCULATION DISPUTE TO BE ARBITRATED

With the support of controlling precedent, National Union's Moving Brief demonstrated that the instant dispute is squarely within the scope of the parties' agreement to arbitrate. In response, Plaintiffs purport to question that case law through out-of-context quotations and tortured analysis. Moreover, Plaintiffs rely upon inapposite precedent concerning insurance coverage disputes and claims of fraudulent inducement – as opposed to disputes concerning the amounts due under the contracts. Plaintiffs' arguments are untenable.

### A. Plaintiffs Mischaracterize Precedent Requiring Calculation Disputes to be Arbitrated

Plaintiffs attempt repeatedly to mischaracterize the decisions cited in National Union's moving brief. For example, Plaintiffs quibble with National Union's citation to Farm Bureau Mut. Ins. Co. v. Am. Int'l Group, Inc., No. 4:03-cv-10050, 2003 WL 21976034 (S.D. Iowa May 28, 2003). In Farm Bureau, the court considered whether an arbitration clause identical to those

4

here required an arbitrated resolution of three misrepresentation claims and one claim seeking a "declaration setting forth what amount, if any, it owes defendants under the terms of the Reinsurance Facilities." Id. at *4. The opinion does not state that any party directed the court to a specific provision requiring interpretation, but the court still ordered the declaration claim to be arbitrated because determining the amount owed by plaintiff would "require the decision-maker to interpret terms of the Reinsurance Facilities." Id. This holding was not limited to certain scenarios, contrary to Plaintiffs' misleading ellipsis in its parenthetical citation, which obfuscates the point that only the *misrepresentation claims* were found not arbitrable. Opp. at 14.

Equally unpersuasive is Plaintiffs' attempt to distinguish In re Fruehauf Trailer Corp., No. 98-514 (PJW), 2007 WL 676248 (Bankr. D. Del. Mar. 2, 2007). Upon review of the same arbitration clause, the Fruehauf court held that the dispute concerning determination of the amounts owed between the parties was arbitrable. No party identified any calculation provision requiring an interpretation but, here again, the court nonetheless determined that any resolution of the dispute required "some interpretation" of the undefined term "actuarial review." Id. at *6. As in Freuhauf, National Union has directed the Court to Article I of the Indemnity Agreements, which states that the Indemnity Agreements and Policies form a single contract. Br. at 15. Plaintiffs dispute National Union's interpretation of Article I insofar as they claim that the Policies exist separate and apart from the Indemnity Agreements and are not incorporated therein (Opp. at 15-16), requiring yet another "interpretation . . . to resolve the dispute." Freuhauf, 2007 WL 676248 at *6; see also Part I, supra (calculation provisions also require interpretation).

Likewise, the Court should reject Plaintiffs' mischaracterization of National Union's citation to New Hampshire Ins. Co. v. Canali Reins. Co., Ltd., No. 03 Civ. 8889 (LTS), 2004 WL 769775 (S.D.N.Y. Apr. 12, 2004). Opp. at 10. National Union explained that, while Judge

Swain declined to compel arbitration because the arbitration clause *did not cover the insurer's failure to perform* (Br. at 12), the court's reasoning bears emphasis: "Because there is no indication that there is any dispute over the calculation of the amounts due, there is nothing in the Petition that even remotely implicates a need for interpretation of the Reinsurance Agreement." Canali, 2004 WL 769775, at *2-3. In contrast, because this matter revolves entirely around a "dispute over the calculation of the amounts due," it must be arbitrated.

> B. Plaintiffs Rely on Irrelevant Policy Coverage and Fraudulent Inducement Cases

Also unavailing is Plaintiffs' reliance on plainly inapposite case law, most notably several decisions that National Union accurately predicted that Plaintiffs would cite – but which provide no support for their argument. Br. at 12 n. 5. These irrelevant decisions are hardly National Union's "own cases." Opp. at 9. Unlike the instant payment calculation dispute, these decisions concern policy coverage disputes or fraud claims.

For example, Plaintiffs rely extensively upon Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. GE Betz, Inc., No. 105991/03, 2003 WL 25668854 (N.Y. Sup. Ct. July 1, 2003), asserting erroneously that a court "found that National Union's claim was not 'on its face' within the scope of the *same* arbitration clause on the *same* grounds." Opp. at 12. Far from concerning the "same" or even related grounds, the Betz "dispute centers entirely on the issue of [insurance] coverage for [a] lawsuit, and not on the interpretation of the Cash Collateral Agreement" that contained the arbitration clause. Betz, 2003 WL 25668854 at *2. There is no such coverage dispute here: indeed, Plaintiffs "admittedly received direct benefits from the insurance policies, in the form of insurance coverage." Opp. at 17. The *only* matter in dispute is how much Plaintiffs owe for that coverage. Thus, Plaintiffs can find no aid in Betz.

The Court should disregard Plaintiffs' curious reliance on additional decisions that National Union previously identified as legally dissimilar from the instant dispute: Magellan

6

Reins. Co. Ltd. v. New Hampshire Ins. Co., 7 Misc.3d 1024(A), 2005 WL 1173903 (N.Y. Sup. Ct. Mar. 15, 2005), and AXA Versicherung AG v. N.H. Ins. Co., 708 F. Supp. 2d 423 (S.D.N.Y. 2010). See Br. at 12 n.5. While Plaintiffs correctly state that Magellan "involved a reinsurance agreement that required the reinsurer to deposit funds into a trust account" (Opp. at 11), they fail to acknowledge that Magellan, like Betz, was a coverage dispute. 2005 WL 1173903, at *1 (petitioner "fail[ed] to deposit funds into a trust account, a requirement under the reinsurance agreement"). Here, all parties agree that Plaintiffs have received the bargained for insurance coverage. Opp. at 17. Similarly misplaced is Plaintiffs' reliance on AXA, which involved fraudulent inducement allegations. 708 F. Supp. 2d at 428, 430. Neither Plaintiffs nor National Union has ever asserted that the present calculation dispute sounds in fraud or is otherwise incapable of resolution "by reference to the terms of the contract." Id. at 428.

Plaintiffs' remaining citations in no way suggest that the instant calculation dispute should not be arbitrated. In Gerling Global Reins. Corp. v. Home Ins. Co., a reinsurer sued to obtain reimbursement from an insurer based on a billing error caused by the insurer's misallocation of insurance losses for purposes of reinsurance reimbursement. 752 N.Y.S.2d 611, 618 (N.Y. App. Div. 2002). Before moving to compel arbitration, the insurer answered the complaint, "conceding the billing error" and "contend[ing] that it relied on inaccurate information." Id. at 616. Based on these concessions, the court held that the agreement did not require any interpretation. Id. at 616-18; see also Fabry's S.R.L. v. IFT Int'l, Inc., 02 Civ. 9855 (SAS), 2003 U.S. Dist. LEXIS 8597, at *17 (S.D.N.Y. May 21, 2003) ("dispute arises out of IFT's *admitted* failure to remit payments it has collected for Fabry's") (emphasis added).

### III. ALL NON-SIGNATORY PLAINTIFFS AGREED TO ARBITRATION

National Union's Moving Brief established that, based on the principles of incorporation by reference, estoppel or agency, all non-signatory Plaintiffs must be compelled to arbitrate this

7

dispute. Br. at 13-16. This conclusion is based on the following critical, and conceded, facts: (1) all Plaintiffs agreed that the Indemnity Agreements, together with the Policies, expressly form "a uniquely negotiated, single contract and no part of the Program would have been issued without the other parts being in force," and that the Policies "are governed by th[ese] Agreement[s]"; and (2) all Plaintiffs received direct benefits from the Policies – by having National Union pay millions of dollars in claims. Id. at 7, 13-14.

In their Opposition, Plaintiffs confirmed these facts. Indeed, Plaintiffs state candidly that the "Non-Signatory Plaintiffs admittedly received direct benefits from the insurance policies." Opp. at 17. There is no dispute that the non-signatory Plaintiffs never objected to the Indemnity Agreements (or the arbitration clauses contained therein) (Br. at 15); indeed, Plaintiffs have *embraced* the Indemnity Agreements. See Taylor Aff. at ¶¶ 4-5 (representing that broker has "work[ed] with Plaintiffs and National Union to administer the Indemnity Agreements," and "the amounts due to National Union have been calculated using the agreed-upon formula set forth in the Indemnity Agreement"). Thus, consistent with the "single contract" provision contained in the Indemnity Agreements, Plaintiffs' express statements and conduct confirm that they understood and fully expected that, in exchange for receiving the substantial direct benefit of insurance coverage, the Policies would be incorporated by reference into, and otherwise subject to, the Indemnity Agreements.

These same concessions estop the non-signatory Plaintiffs from now disclaiming their obligations under the Indemnity Agreements. Br. at 14-15. Plaintiffs' response that the non-signatory Plaintiffs "received no direct benefits from the Indemnity Agreements" is false. Opp. at 17. The Indemnity Agreements and related schedules memorialize a "unique insurance premium and deferral program (the 'Program') to meet the special needs of the Client," pursuant

8

to which significant portions of Plaintiffs' premium and deductible costs are deferred until National Union pays claims to policy claimants. Exs. 2, 5, 8 & 11 at 1. There is no dispute that all Plaintiffs accepted this benefit. Taylor Aff. at ¶ 5. Moreover, but for Plaintiffs' agreement to be bound by the Indemnity Agreements, which are inextricably intertwined with the Policies, no Plaintiff would have received any insurance coverage. Br. at 15. Thus, the plain terms of the Indemnity Agreements, together with the non-signatory Plaintiffs' receipt of substantial insurance coverage for approximately 20 years, estop the non-signatory Plaintiffs from now claiming *for the first time* that the benefits received from the Policies are mutually exclusive from the benefits derived from the Indemnity Agreements.

Finally, all non-signatory Plaintiffs must arbitrate this matter because the signatory Plaintiffs had actual or implied authority to bind all beneficiaries of the insurance coverage provided by National Union. Br. at 16. Plaintiffs contend that National Union's description of Plaintiffs' affiliation is "vague and general" (Opp. at 18), but their substantial affiliation is demonstrated in the public record. Br. at 3 n.1. Moreover, Plaintiffs incorrectly contend that the Second Circuit "addressed this very issue" in Merrill Lynch Inv. Managers v. Optibase, Ltd., 337 F.3d 125 (2d Cir. 2003). Opp. at 18. Optibase did not concern an insurance calculation dispute. Rather, it involved an investor's dispute with its broker-dealer and investment advisor, and the agency arguments were premised on a vague "affiliate provision" and the general "image of a single, integrated firm." 337 F.3d at 128, 130. That is not the case here where:

- each of the Plaintiffs was part of the Tetra Laval Group, reporting to, and receiving financing from, the Tetra Laval Group Board;
- each of the Plaintiffs received direct, tangible benefits from the Indemnity Agreements and underlying Policies;
- the terms of the Indemnity Agreements expressly contemplate that certain non-signatory Plaintiffs must receive any formal notice sent pursuant to the agreements; and
- no non-signatory Plaintiff would have received insurance coverage from National Union but for their signatory affiliates' ability to bind them to the Indemnity Agreements.

9

Br. at 3 n.1, 14-15; see also, e.g., Ex. 2 at Art. IX.[3]

## IV. PLAINTIFFS' STATUTE OF LIMITATIONS DEFENSE MUST BE SUBMITTED TO THE ARBITRATION PANEL

It is settled law that, where a choice of law provision does not include the term "enforcement," any statute of limitations defense may be considered only by an arbitration panel. Br. at 17-19. Consistent with the strong federal policy favoring arbitration, there is no exception to this rule, notwithstanding Plaintiffs' attempt to manufacture a loophole. Indeed, as recently confirmed by the Second Circuit, because the choice of law provisions at issue here do not include the term "enforcement" (or even the terms "validity" and "effect," as in Bechtel) and otherwise "make no mention of timeliness disputes," this Court is "therefore presented with *no clear statement* that a statute of limitations defense should be withheld from the arbitrator." Bechtel v. UEG Araucaria Ltda., 638 F.3d 150, 151, 156 (2d Cir. 2011) (emphasis added).

## CONCLUSION

For all of the foregoing reasons, and those set forth in National Union's moving papers, the Court should stay this action and compel arbitration.

Dated: New York, New York  
       June 15, 2011

SIDLEY AUSTIN LLP

By:  s/  Alex J. Kaplan  
    Andrew W. Stern (astern@sidley.com)  
    Alex J. Kaplan (ajkaplan@sidley.com)  
    Jon W. Muenz (jmuenz@sidley.com)  
    787 Seventh Avenue  
    New York, New York 10019  
    Telephone: (212) 839-5300  
    Facsimile: (212) 839-5599

*Attorneys for Defendant*

---

[3] The non-signatory Plaintiffs rely upon inapposite decisions. For example, in Masefield AG v. Colonial Oil Indus., Inc., the dispute "flow[ed] directly from [plaintiff's] prior debts to [defendant] . . . not the Contract itself." No. 05 C 2231 (PKL), 2005 U.S. Dist. LEXIS 6737, at *12 (S.D.N.Y. Apr. 18, 2005). Here, it is clear that all Plaintiffs received benefits that flowed directly from a single insurance program, comprised of the Indemnity Agreements and Policies.