UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ALFA LAVAL U.S. TREASURY INC. f/k/a
TETRA LAVAL U.S. TREASURY, INC., f/k/a
TETRA LAVAL U.S. HOLDINGS AND
FINANCE, INC. et al.,

                              Plaintiffs,                    11 Civ. 01872 (RJH)

            -against-
                                                    **MEMORANDUM OPINION
NATIONAL UNION FIRE INSURANCE                        AND ORDER**
COMPANY OF PITTSBURGH, PA,

                              Defendant.

Richard J. Holwell, District Judge:

Before the Court is Defendant Nation Union Fire Insurance Company of Pittsburg, PA's ("National Union") motion, pursuant to sections 3 and 4 of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 2, *et seq.*, to stay this action and compel arbitration of its claims for unpaid reimbursements allegedly owed to it by the plaintiffs, an affiliated group of multinational companies. National Union provided insurance coverage to the plaintiffs pursuant to a series of agreements with plaintiff Tetra Laval U.S. Treasury Inc. ("Tetra Laval").[1]  In exchange, Tetra Laval agreed, in a series of Indemnity Agreements with National Union, to pay premiums and to reimburse National Union for certain claims National Union paid on Tetra Laval's and the other plaintiffs' behalves.  The Indemnity Agreements contained an arbitration provision.  On September 7, 2010, after Tetra Laval refused to make certain payments to National Union, National Union served a demand for arbitration on the plaintiffs.  The plaintiffs subsequently

---

[1] As the caption indicates, Tetra Laval at various times has been known as Tetra Laval U.S. Treasury, Inc. and Tetra Laval U.S. Holdings and Finance, Inc., and currently is known as Alfa Laval U.S. Treasury Inc.  All references to "Tetra Laval" in this Opinion refer to that entity.

brought this action seeking a declaratory judgment that National Union's claims are not subject to arbitration.  For the reasons below, National Union's motion to stay this action and compel arbitration is GRANTED.

## BACKGROUND

The plaintiffs are an affiliated group of multinational companies. (Decl. of Harrington Williams in Supp. of Def.'s Mot. to Stay this Action and Compel Arbitration ("Williams Decl.") ¶ 1.)  Beginning in 1988, defendant National Union began providing the plaintiffs with various types of insurance coverage, including workers compensation insurance, commercial general liability insurance, and commercial automobile coverage. (*Id.* ¶ 2.)  The insurance was provided over the course of six policy periods between 1988 and 1998. (*Id.*)  For each policy period, National Union and plaintiff Tetra Laval signed three documents:  (1) a "Policy and Funding Schedule-Retrospective," (2) a "Policy and Funding Schedule-Loss Reimbursement," and (3) an "Indemnity Agreement (Adjustable)." (*See id.* ¶ 4.)  The first two of these documents set forth some of the terms of each of the insurance policies issued, including policy numbers, coverage limits, and deductible amounts, among other things. (*See id.* Exs. 3, 4, 6, 7, 9, 10, 12, 13, 14, 15.)  The third document—the Indemnity Agreement (Adjustable) ("Indemnity Agreement")— governed Tetra Laval's obligation to make payments to National Union and National Union's obligation to issue the insurance policies. (*See id.* Exs. 2, 5, 8, 11, at 1-2.)   Specifically, the Indemnity Agreements provided for a "premium deferral program" and set forth the formula by which the parties would calculate the amounts owed to National Union. (*See id.* Exs. 2, 5, 8, 11.)  Under the Indemnity Agreements, Tetra Laval was obligated to pay National Union a certain calculated premium amount and to reimburse National Union for certain expenses incurred in connection with National Union's efforts to settle claims on Tetra Laval's (and the other

plaintiffs') behalf. (*Id.* ¶ 7.)  Tetra Laval, for example, was responsible for reimbursing National Union for attorney's fees and for the actual amounts paid to settle claims, up to a specified limit. National Union, for its part, was obligated to "invoice (with appropriate backup documentation) Client [Tetra Laval] for all Paid Losses paid by Company [National Union] during any calendar quarter within sixty days of the end of that quarter." (*See, e.g.*, *id.* Ex. 2, at 8.)  Although Tetra Laval was the only plaintiff to sign any of these documents, it is undisputed that all of the plaintiffs received insurance coverage from National Union pursuant to the policies at issue here. (*See id.* ¶ 13.)

The Indemnity Agreements provide, "This Agreement, together with the Policy Funding Schedule(s) and Policy(ies), constitute the Program.  The Program is a uniquely negotiated, single contract and no part of the Program would have been issued without the other parts being in force." (*E.g.*, *id.* Exs. 2, 5, 8, 11, at 2.)  Similarly, the Policy and Funding Schedules-Retrospective and the Policy and Funding Schedules-Loss Reimbursement provide, respectively, that they are "[a]ttached to and a part of the Indemnity Agreement," and "[a]ttached to and a part of the Deductible Loss Reimbursement INDEMNITY AGREEMENT (Adjustable)." (*Id.* Exs. 3, 4, 6, 7, 9, 10, 12, 13, 14, 15, at 1.)  In addition, Article I of the Indemnity Agreements provides, "The Company will issue the insurance policies listed in the Policy Funding Schedule(s)." (*E.g.*, *id.* Ex. 2, at 1.)

The Indemnity Agreements also provide a procedure to be followed in the event that Tetra Laval (the "Client") disputes National Union's calculation of amounts owed under the Agreement.  Article II, Section J of the Indemnity Agreements, entitled "Payments in Dispute," provides that, in the event of a dispute, the Client must (1) notify National Union in writing of the items in dispute, and (2) pay any undisputed portion of the amount due.  National Union, in

3

turn, must "promptly review such items." (*Id.* Ex. 2, at 7.)  Once the dispute has been resolved, the Client then must pay the disputed items within thirty days. (*E.g.*, *id.* Ex. 2, at 6-7.)

The Indemnity Agreements also contain an arbitration provision, which provides, "All disputes or differences arising out of the interpretation of this Agreement shall be submitted to the decision of two (2) Arbitrators, one to be chosen by each party, and in the event the Arbitrators fail to agree, to the decision of an Umpire to be chosen by the Arbitrators." (*E.g.*, *id.* Ex. 2, at 11.)

In 2006, National Union submitted an invoice to the plaintiffs for amounts allegedly due under the Indemnity Agreements. (Aff. of Heather Taylor ("Taylor Aff.") ¶ 7.)  A representative of the plaintiffs' insurance broker analyzed the invoice and determined that many of the claims for which National Union sought reimbursement could not be verified with underlying documentation. (*Id.* ¶¶ 8-9.)  Nonetheless, on December 21, 2006, Tetra Laval wired $1,017,619.83 to National Union, an amount representing a portion of the total amount allegedly due. (Williams Decl. ¶ 14; *see id.* Ex. 16.)  Then, in March 2007, plaintiffs' insurance broker prepared a chart detailing the amounts the plaintiffs allegedly owed, the amounts the plaintiffs already had paid, and the discrepancy amount. (*See id.* Ex. 17.)  The chart divided the amounts allegedly owed based on the entity by whom the disputed loss was incurred.  Specifically, the chart described amounts owed based on coverage provided to plaintiffs Tetra Pak, Inc. ("Tetra Pak"), DeLaval, Inc. ("DeLaval"), and Alfa Laval Inc. ("Alfa Laval"). (*See id.*)  The disputed amounts appear to relate primarily to three claims paid by National Union on the plaintiffs' behalf in favor of three individual claimants, Marvin Frost, Robert Beatty, and Edward Trubich. (*See* Reply Decl. of Alex J. Kaplan in Further Supp. of Def.'s Mot. to Stay This Action and Compel Arbitration ("Kaplan Reply Decl."), Ex. F.)

4

In 2009, National Union sent another invoice to the plaintiffs requesting reimbursement for the disputed losses and for additional premiums also allegedly due.  As in 2006, the plaintiffs' insurance broker requested additional back-up information to verify the amounts. (Taylor Aff. ¶¶ 12-13.)  In 2010, the plaintiffs' broker again requested back-up documentation. (*Id.* ¶ 15.)  Throughout this time, National Union participated in conference calls with representatives of plaintiffs Tetra Pak, DeLaval, and Alfa Laval in an effort to resolve the dispute. (Williams Decl. ¶ 15.)

On September 7, 2010, after those efforts proved unsuccessful, Nation Union served a demand for arbitration on each of the plaintiffs.  The demand asserted "a claim for all amounts owed to it [National Union] as premiums, expenses, fees, reimbursement, damages or as security pursuant to the Agreements." (*Id.* Ex. 1.)  On October 1, 2010, plaintiff Alfa Laval requested a thirty day extension of its time to select an arbitrator. (Decl. of Alex J. Kaplan in Supp. of Def.'s Mot. to Stay This Action and Compel Arbitration ("Kaplan Decl.") ¶ 4.)  The other plaintiffs subsequently joined in this request. (*Id.* ¶ 5.)  On October 29, 2010, the parties agreed to adjourn the arbitration until forty-five days after National Union provided information to the plaintiffs relating to the disputed invoice amounts. (*Id.* ¶ 6.)  On February 2, 2011, National Union produced some documents that purportedly supported the amounts set forth in the 2009 invoice, but the plaintiffs' broker again concluded that the documentation did not support the claims. (*Id.* ¶ 7; *see* Taylor Decl. ¶ 16.)  On March 17, 2011, the plaintiffs filed this action, seeking a declaratory judgment to determine (1) whether National Union's claims are arbitrable, (2) whether the plaintiffs who did not sign the Indemnity Agreements can be compelled to arbitrate, and (3) whether any of National Union's claims for payment are barred by the applicable statute of limitations. (*See* Compl. ¶¶ 21-32.)

**DISCUSSION**

In opposing National Union's motion to compel arbitration, the plaintiffs make three arguments.  First, they argue that the dispute between the plaintiffs and National Union is not arbitrable because it does not "aris[e] out of the interpretation of this [Indemnity] Agreement," as the arbitration clause requires.  Second, the plaintiffs argue that, even if the dispute falls within the scope of the arbitration clause, the plaintiffs who did not sign the Indemnity Agreements (the "non-signatory plaintiffs") cannot be compelled to arbitrate.  Third, the plaintiffs argue that, in any event, the threshold issue of whether National Union's claims are untimely must be decided by the Court, rather than by the arbitrators.

## I.     Whether National Union's Claims are Subject to Arbitration

To determine whether a dispute is arbitrable under the FAA, a court must determine "(1) whether there exists a valid agreement to arbitrate at all under the contract in question . . . and if so, (2) whether the particular dispute sought to be arbitrated falls within the scope of the arbitration agreement." *Hartford Accident & Indem. Co. v. Swiss Reinsurance Am. Corp.*, 246 F.3d 219, 226 (2d Cir. 2001).  Where a valid agreement to arbitrate exists, "doubts as to whether a claim falls within the scope of that agreement should be resolved in favor of arbitrability." *Ace Capital Re Overseas Ltd. v. Cent. United Life Ins. Co.*, 307 F.3d 24, 28 (2d Cir. 2002) (citing *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983)).  Indeed, where a valid agreement exists, "[a]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *AT&T Tech., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986).  Nonetheless, arbitration ultimately is a "creature of contract," and a party cannot be forced to arbitrate a claim he or she did not agree to arbitrate. *Louis*

6

*Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc.*, 252 F.3d 218, 224 (2d Cir. 2001).  To

that end, in determining whether a dispute falls within the scope of an arbitration agreement,

courts in the Second Circuit undertake a three-part inquiry:

> First, recognizing there is some range in the breadth of arbitration clauses,
> a court should classify the particular clause as either broad or narrow.
> Next, if reviewing a narrow clause, the court must determine whether the
> dispute is over an issue that is on its face within the purview of the clause,
> or over a collateral issue that is somehow connected to the main agreement
> that contains the arbitration clause.  Where the arbitration clause is
> narrow, a collateral matter will generally be ruled beyond its purview.
> Where the arbitration clause is broad, there arises a presumption of
> arbitrability and arbitration of even a collateral matter will be ordered if
> the claim alleged implicates issues of contract construction or the parties'
> rights and obligations under it.

*Id.* (internal citations and quotations omitted).

Here, there is no dispute that a valid agreement to arbitrate exists, at least as between

National Union and Tetra Laval, who is the only plaintiff to have signed the Indemnity

Agreements.  Accordingly, the issue is whether the parties' dispute falls within the scope of the

Indemnity Agreements' arbitration clause requiring "[a]ll disputes or differences arising out of

the interpretation of this agreement" to be submitted to arbitration. (*E.g.*, Williams Decl. Ex. 2, at

11.)

The first question for the Court on this point is whether the arbitration clause is broad or

narrow.  The arbitration clause in the Indemnity Agreements is expressly limited to disputes

arising out of the *interpretation* of the Indemnity Agreement.  It thus lacks the "very expansive

language" typical of broad arbitration agreements. *Louis Dreyfus*, 252 F.3d at 225 (finding a

broad clause where the agreement provided that "[a]ny dispute arising from the making,

performance or termination of this Charter Party" is subject to arbitration); *see also Ace Capital*,

307 F.3d at 26 (finding the language "any dispute [that] shall arise between the parties hereto

with reference to the interpretation of this Agreement or their rights with respect to any transaction involved" to indicate a broad clause).  Other courts have found arbitration clauses similar to this one to be narrow, *see, e.g.*, *AXA Versicherung AG v. N.H. Ins. Co.*, 708 F. Supp. 2d 423, 428 (S.D.N.Y. 2010); *N.H. Ins. Co. v. Canali Reinsurance Co.*, No. 03 Civ. 889, 2004 WL 769775, at *2 (S.D.N.Y. Apr. 12, 2004); *Farm Bureau Mut. Ins. Co. v. Am. Int'l Group, Inc.*, 03 Civ. 10050, 2003 WL 21976034, at *2 (S.D. Iowa May 28, 2003), and National Union's conclusory statements to the contrary do little to distinguish this case from those.

The next question is whether "the dispute is over an issue that is on its face within the purview of the clause, or over a collateral issue." *Louis Dreyfus*, 252 F.3d at 224.  In that regard, "arbitration clauses limited to interpretive disputes are widely understood to cover only those disputes that can be resolved by reference to the terms of the contract." *AXA Versicherung*, 708 F. Supp. 2d at 428-29 (S.D.N.Y. 2010) (citing *United Offshore Co. v. S. Deepwater Pipeline Co.*, 899 F.2d 405, 409-10 (5th Cir. 1990); *Washburn v. Societe Commerciale de Reassurance*, 831 F.2d 149, 150-52 (7th Cir. 1987)).  The parties here dispute the source of their underlying dispute.  National Union contends that the dispute is over the proper calculation of the amounts owed.  As such, National Union argues that the dispute "aris[es] out of the interpretation" of the Indemnity Agreements because the Indemnity Agreements set forth the formula(s) by which the plaintiffs' payment obligations are calculated.  Accordingly, in National Union's view, the resolution of the dispute will turn on the interpretation and application of those formulas. National Union cites at least one case that has found that a dispute relating to the calculation of an amount due fell within the scope of an arbitration clause that, like the one here, was limited to disputes arising out of the interpretation of the agreement. *See In re Fruehauf Trailer Corp.*, No. 98-514, 2007 WL 676248, at *6 (Bankr. D. Del. Mar. 2, 2007) (finding dispute arbitrable where

plaintiff and defendant disagreed about the calculation of the cash collateral plaintiff was required to deposit); *see also Farm Bureau Mut. Ins. Co.*, 2003 WL 21976034, at *4 (finding a dispute arbitrable where plaintiff sought "a declaration setting forth what amount, if any, it owes defendants under the terms of the Reinsurance Facilities").  National Union also cites another case that has found a dispute not to fall within the scope of a similar arbitration agreement where "there [was] no indication that there is any dispute over the *calculation* of the amounts due." *Canali Reinsurance Co.*, 2004 WL 769775, at *2 (emphasis added).

Plaintiffs, on the other hand, contend that the dispute is not about the *calculation* of amounts due, but instead is about whether any amounts are due at all.  At oral argument, counsel for plaintiffs suggested that the disputed claims for which National Union invoiced plaintiffs never were incurred by National Union to begin with, in part because National Union never sent any documentation to plaintiffs to support those claims.  Plaintiffs further contend that National Union has failed to identify any terms in the Indemnity Agreement that require interpretation, and plaintiffs have cited cases that have denied motions to compel arbitration pursuant to similar arbitration clauses under such circumstances. *See Magellan Reinsurance Co. v. N.H. Ins. Co.*, No. 1017890/05, 2005 WL 1173903, at *2-3 (N.Y. Sup. Ct. Mar. 15, 2005) (finding dispute not subject to arbitration where "Petitioner, in a vague, conclusory statement, merely asserts, without further elaboration, that the dispute is one of interpretation"); *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. GE Betz, Inc.*, No. 105991/03, 2003 WL 25668854, at *3-4 (N.Y. Sup. Ct. July 1, 2003) (finding dispute not arbitrable where petitioner identified terms to be interpreted but did not "set out what the dispute is that requires these provisions to be interpreted" and where respondent explained that the dispute related to which of a number of insurance policies would cover a certain claim).

9

The cases cited by both parties suggest that for a dispute to fall within an arbitration clause limited to disputes arising out of the interpretation of the agreement, the party seeking arbitration must identify some term or provision requiring interpretation, and there also must be some indication as to how the interpretation of that term or provision will be relevant to the resolution of the dispute. *See Century Indem. Co. v. Clearwater Ins. Co.*, 06 Civ. 0424, 2007 WL 1599157, at *3 (S.D.N.Y. June 4, 2007) (where dispute centered on reinsurer's failure to pay claims based on insurer's alleged failure to meet conditions precedent to coverage, dispute required interpretation of the agreement to determine whether insurer failed to comply "with Paragraph 9 [of the agreement] because it has not provided Clearwater with 'full and complete access to all of Century's records'; Paragraph 10 because it has not provided Clearwater with 'prompt notice of the occurrence and claim'; and Paragraph 12 because it has not provided Clearwater with 'sufficient proof of loss'"); *In re Fruehauf Trailer Corp.*, 2007 WL 676248, at *6 (where dispute centered on the amount of cash collateral due, and adequacy of cash collateral was determined by defendant's "actuarial review," dispute arose out of interpretation of that term); *Farm Bureau Mut. Ins. Co.*, 2003 WL 21976034, at *4 (where dispute centered on amount owed, interpretation of the term "Construction risks" to mean "construction risks originally underwritten by AIG" would limit the amount due under the agreement); *NECA Ins. Ltd. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 595 F. Supp. 955, 958 (S.D.N.Y. 1984) (dispute arose out of interpretation of the agreement where liability would be determined by "[w]hether the payment in excess of $500,000 was in settlement of a claim within the meaning of Article IX, was an element of National Union's net loss within the meaning of Article IV(c), was within Article V's 100% reinsurance clause, and is encompassed by Article XV's 'follow the fortunes' clause"); *Magellan Reinsurance Co.*, 2005 WL 1173903, at *2-3 (where petitioner did not

10

explain how interpretation of any particular term would be relevant in resolving dispute, dispute did not arise out of the interpretation of the agreement); *GE Betz, Inc.*, 2003 WL 25668854, at *3-4 (same).

From the present record, the Court can identify a dispute over claims allegedly paid by National Union on behalf of three individuals, Marvin Frost, Robert Beatty, and Edward Trubich. The discrepancy is explained in three charts and an email prepared by Steve Harris, a Managing Director of plaintiff Alfa Laval Agri, Inc. (*See* Kaplan Reply Decl. Ex. F (emails from March 2007).) The charts reveal the following:

National Union billed plaintiffs for "Indemnity" and "Allocated Expense" amounts for each claimant. The charts divide the total amount billed into two time periods: Indemnity and Allocated Expenses for the period through December 31, 1999, and Indemnity and Allocated Expenses for the period December 31, 1999 through June 30, 2003.[2] According to Harris's calculations in the charts, however, plaintiffs were not responsible for the full amounts billed. Instead, an email prepared by Harris explains, "[U]nder the policies in question, Tetra Laval was responsible for up to $250,000 in indemnity payments, plus a proportional share of the allocated expense." (*Id.*) The email further explains that Tetra Laval's proportional share of the allocated expenses would be 100% if the indemnity payment was less than $250,000, and, if the indemnity payment was greater than $250,000, then Tetra Laval's proportional share would be equal to $250,000 divided by the total indemnity payment. (*Id.*; *see* Williams Decl. Ex. 2 (a provision of the Indemnity Agreement providing, "[A]ll Allocated Loss Expenses shall be the shared responsibility of the Company and Client on a pro-rata basis in the same relationship as

---

[2] The total figures invoiced by National Union for each of the three claimants are as follows: (1) Marvin Frost: $358,643.66 in Indemnity and $59,943.00 in Allocated Expenses, (2) Robert Beatty: $364,664.83 in Indemnity and $43,501.10 in Allocated Expenses, and (3) Edward Trubich: $418,055.90 in Indemnity and $76,065.10 in Allocated Expenses. (*See* Kaplan Reply Decl. Ex. F, 4-6.)

11

indemnity paid subject to the Maximum Insurance Cost set out in paragraph D").)  Harris's charts determine that for each claimant, Tetral Laval was obligated to pay $250,000 in Indemnity plus a percentage of the Allocated Expenses.  Harris determined the appropriate percentage by dividing $250,000 by the total Indemnity, as billed by National Union.  According to an email from Heather Taylor, an employee of the plaintiffs' insurance broker, Harris's calculations revealed a total discrepancy of $454,688 with respect to the claims paid to Frost, Beatty, and Trubich. (*See* Kaplan Reply Decl. Ex. F, at 2.)

Harris's actions do not appear consistent with the plaintiffs' explanation of their failure to pay.  The actions taken by Harris with respect to the disputed claims are not the acts of a person who flat out disputes the existence of the charges in the first instance.  Indeed, Harris's calculations conclude that plaintiffs do in fact owe a portion of the amount billed for each of the claimants and for both of the timeframes referenced in the charts.  In short, it appears that National Union sent an invoice to plaintiffs for amounts allegedly due, that Harris then used those figures to calculate a different amount due, and that Harris explained his calculations with reference to his understanding of the Indemnity Agreements.  Such conduct suggests that the discrepancy arises out of Harris's competing interpretation of the proper manner in which to calculate amounts owed under the Indemnity Agreement.

With respect to specific provisions of the Indemnity Agreement that may require interpretation to resolve the dispute, at least two appear relevant.  First, the clause providing that "all Allocated Loss Expenses shall be the shared responsibility of the Company and Client on a pro-rata basis in the same relationship as indemnity paid subject to the Maximum Insurance Cost set out in paragraph D," (*E.g.*, Williams Decl. Ex. 2, at 4), likely will be relevant in determining whether Harris's calculations reflect the proper attribution of Allocated Expenses to Tetra Laval.

Second, to the extent Harris's calculations reveal a dispute over whether the Indemnity paid to each claimant over the different time periods is subject to a single deductible, the definition provided in Article IV, Section K of the Indemnity Agreements may be relevant.  That section provides, "The 'Loss Limit' and/or 'Deductible' for the Policies are the amounts shown in the Policy Funding Schedule(s) and are applied separately: . . . (iii) to each claim for personal injury or advertising injury or any other injury or damage." (*E.g.*, *id.* at 10.)

On the other hand, additional evidence in the record suggests that the parties may not dispute the *calculation* of the amounts, but instead whether the amounts are owed at all.  On September 29, 2009, Jason Goldy, an attorney, wrote a letter to Tetra Laval on behalf of National Union that provides some detail on the dispute.  Like the emails between Harris and Taylor, Goldy's letter indicates that the dispute revolves around the Frost, Beatty, and Trubich claims.  The letter sets forth the amount National Union believes is owed with respect to each of those claims.  Notably, the amounts in the Goldy letter purportedly owed by Tetra Laval with respect to the Frost and Trubich claims ($291,784.51 and $297,281.42, respectively) are exactly the same as the amounts in Harris's charts in the row labeled "Total Payable by TL." (*Compare* Williams Decl. Ex. 18 (figures labeled "Billable to Tetra Laval") with Kaplan Reply Decl. Ex. F, 4, 6 (figures labeled "Total" under "Total Payable by TL").)[3]  With respect to the Beatty claim, Goldy's letter indicates that Tetra Laval owes $283,267.10, while Harris's figures indicate that Tetra Laval owes $279,822.66, a difference of less than $3500.00.  The fact that the amounts allegedly due as calculated by National Union match the amounts admittedly due as calculated by one of plaintiffs' Managing Directors certainly undermines National Union's contention that

---

[3] That these figures match seems a little strange because Harris's 2007 numbers indicate that Tetra Laval already had paid a portion of the total owed. (*See* Kaplan Reply Decl. Ex F, 4-6 (rows labeled "Paid by TL").)  This, of course, may indicate that the parties dispute whether payment of amounts admittedly due was made at all.  Such a dispute would not implicate the interpretation of the Indemnity Agreement.

the dispute revolves around the proper calculation of the amounts due pursuant to the terms of the Indemnity Agreement.  In addition, plaintiffs have submitted an affidavit from Heather Taylor that states that there was never any dispute between the parties about how to interpret any terms of the Indemnity Agreement. (Taylor Aff. ¶ 9.)  Instead, Taylor asserts that the reason for plaintiffs' non-payment was that National Union had not submitted any documentation to support the amounts allegedly due. (*Id.*)[4]

In the end, the parties surely dispute whether and how much money plaintiffs owe National Union.  The current record, however, provides only a murky picture of the reason(s) for that dispute.  The present record reveals that the parties' dispute *might* arise out of the interpretation of the Indemnity Agreement.  In that regard, to the extent that Harris's calculations reveal an admission that some amount is due with respect to the Frost, Beatty, and Trubich claims, and to the extent that Harris (on behalf of the plaintiffs) calculated the amount owed differently than National Union while using the same figures, the resolution of the dispute likely will require the decision-maker to interpret the terms of the Indemnity Agreement.  Given that the record provides some support for this conclusion, and in light of the strong federal policy requiring "'any doubts concerning the scope of arbitrable issues [to] be resolved in favor of arbitration,'" *Louis Dreyfus*, 252 F.3d at 223 (quoting *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 24-25), National Union has shown enough to permit the Court to conclude that the dispute is "over an issue that is on its face within the purview of the clause," as required in the case of a

---

[4] While the Indemnity Agreements contain a provision that requires National Union to provide "appropriate" documentation to support its invoices of "Paid Losses," (*E.g.* Williams Decl. Ex 2, at 8.), there surely is a difference between a situation where National Union provides some arguably "appropriate" documentation and a situation where it provides none at all.  The latter appears to be what plaintiffs contend happened here, in the sense that plaintiffs seem to dispute whether National Union made certain payments on plaintiffs' behalves at all.  This question appears to be a largely factual inquiry that does not require interpretation of the parties' agreement.  However, to the extent that plaintiffs have refused to pay because of inadequate (rather than non-existent) documentation, the dispute certainly would arise out of the interpretation of the term "appropriate backup documentation," (*id.*), and therefore would be subject to arbitration.

narrow arbitration clause. *Id.* at 224. Accordingly, the parties' dispute falls within the scope of the arbitration clause.

## II.        Whether the Non-Signatory Plaintiffs May Be Compelled to Arbitrate

Although arbitration, as a creature of contract, generally may not be forced upon a person who did not agree to it, the Second Circuit Court of Appeals "has made clear that a nonsignatory party may be bound to an arbitration agreement if so dictated by the 'ordinary principles of contract and agency.'" *Thomson-CSF, S.A. v. Am. Arbitration Ass'n*, 64 F.3d 773, 776 (2d Cir. 1995) (quoting *McAllister Bros., Inc. v. A&S Transp. Co*., 621 F.2d 519, 524 (2d Cir. 1980)) (citing *A/S Custodia v. Lessin Int'l, Inc.*, 503 F.2d 318, 320 (2d Cir. 1974)). Accordingly, the Court of Appeals recognizes "five theories for binding nonsignatories to arbitration agreements: 1) incorporation by reference; 2) assumption; 3) agency; 4) veil-piercing/alter ego; and 5) estoppel." *Id.* at 777.

National Union contends that the non-signatory plaintiffs must arbitrate under an estoppel theory. "'A nonsignatory may be estopped from avoiding arbitration where it knowingly accepted the benefits of an agreement with an arbitration clause.'" *Bank of Am. Natl. Assn. v. Sopher*, 10 Civ. 8870, 2011 WL 2419872, at *3 (S.D.N.Y. June 8, 2011) (quoting *MAG Portfolio Consult, GMBH v. Merlin Biomed Grp. LLC*, 268 F.3d 58, 61 (2d Cir. 2001)); *see also Deloitte Noraudit A/S v. Deloitte Haskins Sells, U.S.*, 9 F.3d 1060, 1064 (2d Cir. 1993). "The benefits must be direct—which is to say, flowing directly from the agreement." *Oppenheimer Co. Inc. v. Deutsche Bank AG*, No. 09 Civ. 8154, 2010 WL 743915, at *2 (S.D.N.Y. Mar. 2, 2010) (quoting *MAG Portfolio*, 268 F.3d at 61); *see also Am. Bureau of Shipping v. Tencara Shipyard S.P.A.*, 170 F.3d 349, 353 (2d Cir. 1999). By contrast, "the benefit derived from an agreement is indirect," and is therefore insufficient to support estoppel, "where the nonsignatory exploits the

contractual relation of parties to an agreement, but does not exploit (and thereby assume) the agreement itself." *Republic of Ecuador v. ChevronTexaco Corp.*, 499 F. Supp. 2d 452, 458 (S.D.N.Y. 2007); *see also MAG Portfolio*, 268 F.3d at 61.  Likewise, "the mere fact of a nonsignatory's affiliation with a signatory will not suffice to estop the nonsignatory from avoiding arbitration, no matter how close the affiliation is." *Oppenheimer Co.*, 2010 WL 743915, at *2.

The plaintiffs here acknowledge that all of the non-signatory plaintiffs received "direct benefits from *the insurance policies*, in the form of insurance coverage." (Pl.'s Mem. of Law in Opp'n to Def.'s Mot. to Stay This Action and Compel Arbitration ("Pl.'s Mem."), 17.) Nonetheless, the plaintiffs argue that the non-signatory plaintiffs cannot be forced to arbitrate because they received no direct benefits from the Indemnity Agreements, which contain the arbitration clauses.  What the plaintiffs fail to recognize, however, is that the Indemnity Agreements are the source of National Union's obligation to issue the insurance policies through which the non-signatory plaintiffs obtained coverage.  Indeed, Article I of each Indemnity Agreement provides:  "The Company [National Union] will issue the insurance policies listed in the Policy Funding Schedule(s)." (Williams Decl. Exs. 2, 5, 8, 11, at 2.)  The Indemnity Agreements thus require National Union to issue the insurance policies, and the non-signatory plaintiffs received insurance coverage from those policies.  Accordingly, the non-signatory plaintiffs have received a direct benefit from the Indemnity Agreements and are estopped from denying their obligation to arbitrate as the Agreements require. *Compare Tencara Shipyard*, 170 F.3d at 351–53 (finding estoppel where a shipyard's contract with a classification society for classification of a ship lowered the non-signatory owners' insurance rates and allowed the owners to fly national colors) *and Deloitte Noraudit*, 9 F.3d at 1061–64 (finding estoppel where

a company's settlement with its litigation opponent permitted the company's non-signatory affiliates to use a trade name, and where the non-signatory affiliates had knowledge of the settlement and actually used the trade name), *with Thomson–CSF*, 64 F.3d at 778–79 (refusing to find estoppel where a non-signatory competitor was able to squeeze out its rival because of the rival's prior entry into an exclusive dealing agreement with a company bought by the non-signatory competitor, which agreement the competitor never intended to invoke).[5]

### III.   Whether the Court or the Arbitrators Decide the Threshold Issue of Timeliness

The plaintiffs argue that the Court—and not the arbitrators—should decide whether National Union's claims are barred by New York's six-year statute of limitations for actions alleging breach of contract. (*See* Compl. ¶¶ 30-31 (citing N.Y. C.P.L.R. § 213(2)).)  The plaintiffs point out that National Union would be barred from recovering damages for any breaches of the Indemnity Agreements that occurred before September 7, 2004 (six years before National Union filed its demand for arbitration).  The plaintiffs contend that most, if not all, of their alleged breaches occurred prior to that date. (*See id.* ¶ 32.)

While the Supreme Court has held that it is a question for the court "whether an arbitration clause in a concededly binding contract applies to a particular type of controversy," it also has held that "'"procedural" questions which grow out of the dispute and bear on its final disposition' are presumptively *not* for the judge, but for an arbitrator, to decide." *Howsam* v. *Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002) (quoting *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 557 (1968)) (citing *AT&T Techs., Inc.*, 475 U.S. at 651-52).  The Supreme Court has indicated that these "procedural" questions include "'whether prerequisites

---

[5] Because the Court has found that the non-signatory plaintiffs are bound under an estoppel theory, it is unnecessary to address National Union's other arguments for requiring the non-signatory plaintiffs to arbitrate, namely, incorporation by reference and agency.

such as *time limits,* notice, laches, estoppel, and other conditions precedent to an obligation to arbitrate have been met.'" *Id.* at 85 (quoting Revised Unif. Arbitration Act § 6, cmt. 2 (2000), 7 U.L.A. 13 (Supp. 2002)).  Indeed, the Court of Appeals for the Second Circuit has "stated emphatically that *any* limitations defense—whether stemming from the arbitration agreement, arbitration association rule, or state statute—is an issue to be addressed by the arbitrators." *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 121 (2d Cir. 1991); *see also Trafalgar Shipping Co. v. Int'l Mill Co.*, 401 F.2d 568, 571 (2d Cir. 1968) ("[A]ll questions of delay which relate to issues which the parties have agreed to submit to arbitration [must] be resolved by the arbitrators, not the court.").  Nonetheless, parties to an arbitration agreement are free to agree to the contrary and of course may provide that the court, rather than the arbitrator, should decide issues of timeliness. *See Trafalgar*, 401 F.2d at 572.

The plaintiffs argue that the Indemnity Agreements here show that the parties in fact agreed not to arbitrate statute of limitations questions.  As evidence, the plaintiffs point to the limited language of the arbitration clause and the Indemnity Agreements' choice of law clause, which provides that "[a]ll matters of interpretation and/or construction of this Agreement are to be interpreted and construed under the law of the State of New York." (*E.g.*, Williams Decl. Ex. 2, at 14.)  The significance of the choice of law clause, according to the plaintiffs, is that it suggests that the parties agreed to have a court decide timeliness issues because New York law permits a party to assert a relevant statute of limitations "as a bar to the arbitration on an application to the *court*." N.Y. C.P.L.R. § 7502(b) (emphasis added). (*See* Pl.'s Mem. 22.)

In *Bechtel do Brasil Construcoes Ltda v. UEG Araucaria Ltda.*, 638 F.3d 150 (2d Cir. 2011), however, under circumstances that suggested, more strongly than here, that the parties

intended to invoke C.P.L.R. § 7502(b), the Second Circuit held that the question of timeliness

was for the arbitrators.  In *Bechtel*, the parties' arbitration agreement provided

> Any dispute, controversy, or claim arising out of or relating to the Contract, or the
> breach, termination or validity thereof . . . shall be finally settled by arbitration in
> accordance with the Rules of Conciliation and Arbitration of the International
> Chamber of Commerce (the "ICC") then in effect (the "Rules"), *except as these
> rules may be modified herein.*

*Id.* at 152 (emphasis added).  The agreement also contained a number of choice of law clauses,

which provided that (1) "Any arbitration proceeding or award rendered hereunder and the

validity, effect and interpretation of this agreement to arbitrate shall be governed by the laws of

the state of New York," and (2) "The law governing the procedure and administration of any

arbitration . . . is the law of the State of New York." *Bechtel*, 638 F.3d at 152.   The plaintiff in

*Bechtel* argued that the timeliness question was for the court because, pursuant to the terms of

the arbitration agreement, the choice of law clauses modified the ICC rules to invoke C.P.L.R. §

7502(b). *Id.* at 155.  The court, however, held that the issue was for the arbitrators, stating that

"while we think the modification language *could* be read to incorporate C.P.L.R. 7502(b), we are

not convinced that it does so without doubt." *Id.* at 158.  The court continued, "Even if we were

to adopt the broad reading of the exceptions clause that Bechtel advances, it would not follow

that the contracts' choice-of-law provisions *must* be understood to permit recourse to C.P.L.R.

7502(b)."  Indeed, as the Supreme Court has held, general choice-of-law clauses serve to

incorporate only the chosen state's "substantive rights and obligations, [but] not the State's

allocation of power between alternative tribunals." *Mastrobuono v. Shearson Lehman Hutton,

Inc.,* 514 U.S. 52, 60 (1995).  Accordingly, the Second Circuit found the contract to be

ambiguous with respect to the timeliness issue and thus resolved that ambiguity in favor of

arbitration. *Bechtel*, 638 F.3d at 158.

The plaintiffs argue that here, unlike in *Bechtel*, the Indemnity Agreements are not ambiguous with respect to the timeliness issue because the narrow scope of the arbitration clauses plainly leaves timeliness disputes to the court.  To be sure, the arbitration clause at issue in *Bechtel* was significantly broader than the arbitration clause at issue here.  Nonetheless, the arbitration clause in the Indemnity Agreements is broad enough to cover the parties' statute of limitations dispute.  The arbitration clause is limited to "[a]ll disputes arising out of the interpretation of this Agreement."  The timeliness dispute here centers on when National Union's claims accrued.  According to National Union, no claim accrued until at the earliest December 21, 2006, when the plaintiffs, pursuant to the terms of the "Payments in Dispute" section of the Indemnity Agreements, wired the undisputed portion of the amounts allegedly due to National Union.  The plaintiffs suggest that their alleged breaches occurred earlier, at a time well outside the limitations period.  Resolution of this dispute requires an interpretation of the Indemnity Agreements to determine the time, if any, at which the plaintiffs' nonpayment amounted to a breach of their duties under the Agreement. *See Ely-Cruikshank Co., v. Bank of Montreal*, 615 N.E.2d 985, 986 (N.Y. 1993) ("In New York, a breach of contract cause of action accrues at the time of the breach.").

Furthermore, the Indemnity Agreements' choice of New York law clause does substantially less than the corresponding clauses in *Bechtel* to suggest that the parties agreed to have the court decide statute of limitations issues.  In *Bechtel*, the parties' agreement provided (1) "Any arbitration proceeding or award rendered hereunder and the validity, effect and interpretation of this agreement to arbitrate shall be governed by the laws of the state of New York," and (2) "The law governing the procedure and administration of any arbitration . . . is the law of the State of New York." *Bechtel*, 638 F.3d at 152.  By contrast, the choice of law clause

here merely provides that "matters of interpretation and/or construction . . . are to be interpreted and construed under" New York law. (Williams Decl. Ex. 2, at 14.)  This language, even combined with the narrow scope of the arbitration clauses in the Indemnity Agreements, is far from sufficient to overcome the rule that general choice-of-law clauses incorporate only the chosen state's "substantive rights and obligations, [but] not the State's allocation of power between alternative tribunals." *Mastrobuono*, 514 U.S. at 60.  Thus, given the strong presumption that timeliness issues are for the arbitrators, along with the conclusion that the parties' timeliness dispute falls within the scope of the arbitration clause, a general choice of law clause does little to support the plaintiffs' argument that the statute of limitations question is for the Court.  Accordingly, the question is for the arbitrators.

## CONCLUSION

For the reasons stated above, defendants' motion to compel arbitration [9] is GRANTED in its entirety.  The Clerk of the Court is directed to close this case.

SO ORDERED.

Dated:  New York, New York
      January 25, 2012

                                  Richard J. Holwell
                         United States District Judge